622 F.2d 1279
 104 L.R.R.M. (BNA) 2838, 89 Lab.Cas. P 12,115
 Bernadine ALVEY, Gilda Faulkenburg, and Rose Waninger,
Individually and as representatives for and on
behalf of their fellow employees
similarly situated,
Plaintiffs-Appellants,
v.
GENERAL ELECTRIC COMPANY, International Union of Electrical
Radio and Machine Workers (AFL-CIO), Local 805 of the
International Union of Electrical Radio and Machine Workers
(AFL-CIO), et al., Defendants-Appellees.
 No. 79-1636.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 24, 1980.
Decided June 11, 1980.
 
 Theodore Lockyear and Steve Barber, Lockyear, Barber & Kornblum, Evansville, Ind., for plaintiffs-appellants.
 George J. Zazas, Barry A. Macey, Indianapolis, Ind., for defendants-appellees.
 Before FAIRCHILD, Chief Judge, and SPRECHER and WOOD, Circuit Judges.
 HARLINGTON WOOD, Jr., Circuit Judge.
 
 
 1
 Plaintiffs[1] brought this class action against their former employer, defendant General Electric Company (General Electric) and their union, defendant International Union of Electrical Radio and Machine Workers (AFL-CIO) (the International) and Local 805 of the International (the Local),[2] challenging the propriety of a modification of the applicable seniority rules for recalling members laid-off from employment at General Electric's Tell City, Indiana facility. Plaintiffs object to the application of a provision of the International's constitution to deprive them, as laid-off employees, from participating in the vote among members of the Local to authorize and ratify the revised seniority rules. Plaintiffs allege also that General Electric breached its collective bargaining agreements by agreeing to the revised rules, and that the union violated their equal right to vote on union matters, a right guaranteed under the "Bill of Rights" provision of the Labor-Management Reporting and Disclosure Act of 1959 (Landrum-Griffin), § 101, 73 Stat. 519 et seq., 29 U.S.C. § 401 et seq., and breached its duty of fair representation.
 
 
 2
 After a jury verdict in favor of General Electric and the union, Judge Dillin entered a partial judgment in favor of General Electric on the breach of contract claim and the union on the duty of fair representation claim. Plaintiffs and the union then briefed the Landrum-Griffin Act claim, which they had previously reserved for the court. Later, Judge Dillin issued a memorandum decision in favor of the union on that claim and entered final judgment on all claims. This appeal followed.
 
 
 3
 Although there is little dispute about the facts, some review is helpful. In 1945 General Electric established a plant at Tell City, Indiana, to manufacture electronic tubes primarily for use in radio and television sets (Tube). The International, through the Local, served as the Tell City employees' bargaining representative. In 1965 General Electric announced plans to phase-out the production of tubes over the next two years and to move its Specialty Motor Department (Motor) to Tell City. After Motor moved to Tell City, General Electric and the union, which also represented Motor employees, became concerned with the adoption of suitable procedures for transferring Tube employees to Motor whenever additional employees might be needed by the new department. The parties entered into a "Retraining Agreement," which in pertinent part prevented Tube employees facing layoff from transferring to Motor and thereby displacing Motor employees with less seniority. Tube employees were allowed, however, to transfer to open jobs in Motor. The agreement further provided that Tube and Motor would maintain separate layoff and recall systems. No Tube employee regardless of seniority could "bump" a Motor employee.
 
 
 4
 Instead of phasing-out within two years as originally contemplated, the Tube operation continued, though on an uncertain basis. Some Tube employees secured transfers under the agreement to Motor, but others for various reasons remained at Tube. Late in 1968 General Electric and the Union informally agreed to a new recall procedure, which provided that laid-off employees of both departments would be pooled and recalled to either operation according to seniority. This procedure was followed until 1974 when about one-half of the remaining Tube employees were laid-off, and it became apparent that Tube would finally close completely that year. There was also a seasonal layoff of some Motor employees. Since Motor employees generally had lower seniority than Tube employees, laid-off Motor employees could expect under the informal procedure to be outranked by more senior Tube employees in a future Motor recall.
 
 
 5
 A union member, in view of these circumstances, introduced at a Local meeting a new recall proposal, which provided that laid-off Motor employees would be recalled to Motor jobs before any laid-off Tube employees would be eligible for a Motor job. In a close vote the proposal failed. However, the International constitution provides that a special membership meeting can be called upon the petition of ten percent of the membership. On October 6, 1974, at a special meeting called pursuant to that provision, a similar recall modification proposal was presented to the membership.
 
 
 6
 We now approach the factual basis for the first critical issue. The constitution of the International provides that only members in good standing may participate in union affairs and that "(a)ny member shall continue to be in good standing only for the dues period for which dues were required and paid." Not only were laid-off members not required to pay dues, but they were prohibited from making a voluntary payment of dues in order to maintain their good standing. As a result of these constitutional provisions, neither the laid-off Motor employees nor the laid-off Tube employees were permitted to participate or vote at the October 6, 1974 meeting. Two hundred and seven Tube employees and seventy Motor employees were on layoff at that time and were therefore excluded from the meeting.
 
 
 7
 The meeting was stormy. Even though most of the Local officers and the members of the Local bargaining committee actively opposed the proposal, the membership voted in favor of it. In effect, the proposal restored the recall procedure that had been followed until late 1968. The Local officials then presented the proposal to General Electric for its approval, and approval followed. When the membership formally ratified the recall procedure alteration, Tube had already closed. Consequently, there were no Tube employees qualified under the International constitution to vote on the ratification.[3]
 
 
 8
 There was evidence that during the time General Electric had the union proposal under consideration, it considered the impact the proposal would have on the age and sex composition of the Motor work force. That is the basis of plaintiffs' claim that General Electric breached the anti-discrimination provision of the National Agreement between General Electric and the International.
 
 I. Landrum-Griffin
 
 9
 29 U.S.C. § 411(a)(1) guarantees all union members "equal rights and privileges," inter alia, "to participate in the deliberations and voting upon the business of (union membership) meetings." That right, however is not absolute; section 411(a)(1) contains a proviso making it "subject to reasonable rules and regulations in (the union's) constitution and bylaws." See Calhoon v. Harvey, 379 U.S. 134, 139, 85 S.Ct. 292, 295, 13 L.Ed.2d 190 (1964). Subsection (b) of section 411 buttresses subsection (a) by providing that constitutional or bylaw provisions inconsistent with subsection (a) shall be of no force or effect.[4]
 
 
 10
 Against this statutory background, plaintiffs challenge a provision of the International's constitution, which provides that a union member continues to be in good standing "only for the dues period for which dues were required and paid." Laidoff members, neither being required nor permitted to pay dues, were precluded by this provision from maintaining their membership in good standing so as to permit them to participate in union affairs. The practical effect in the context of this case is that over two hundred Tube employees were barred from voting on a matter of utmost concern to them: the order in which laid-off Tell City employees both from Motor and Tube would be recalled.
 
 
 11
 Of initial concern is whether section 411 protects laid-off employees where the union constitution precludes them from maintaining their membership in good standing. Rights under section 411 are granted to "every member of a labor organization." Congress defined the term "member" when used in the Landrum-Griffin Act as encompassing "any person who has fulfilled the requirements for membership in such organization, and who neither has voluntarily withdrawn from membership nor has been expelled or suspended from membership after appropriate proceedings consistent with lawful provisions of the constitution and bylaws of such organization." 29 U.S.C. § 402(o ).
 
 
 12
 As is apparent from the choice of terms, Congress did not limit the protections of the Landrum-Griffin Act to those whom the union recognizes as members. Rather, one who has fulfilled the membership requirements, that is, one who is a member in substance, is protected. Hughes v. Local 11, International Association of Bridge, Structural & Ornamental Ironworkers, 287 F.2d 810, 814 (3d Cir.), cert. denied, 368 U.S. 829, 82 S.Ct. 51, 7 L.Ed.2d 32 (1961). There is little dispute that the laid-off employees satisfied the union's membership requirements. There is also little dispute that the laid-off employees were not members in good standing because they had not paid dues since their layoff. But under section 402(o ), one who has met the membership requirements remains a member within the meaning of the Act until one of two events occurs: (1) the member voluntarily withdraws from the union or (2) the union expels or suspends the member after "appropriate proceedings"[5] held pursuant to lawful constitutional or bylaw provisions. See Brennan v. Independent Lift Truck Builders Union, 490 F.2d 213, 217 & n.6 (7th Cir. 1974). Neither of these events occurred here; the union simply classified the laid-off employees as being no longer in good standing. Since laid-off employees did not voluntarily withdraw and the union did not expel or suspend them, they are "members" and therefore protected by the equal rights guarantee of section 411, subject to the union's reasonable rules and regulations.
 
 
 13
 The right of a union to limit participation in union affairs to members in good standing is not in issue. Such a rule is clearly reasonable and we have little doubt that it would withstand scrutiny under section 411. We are faced instead with a substantially more onerous rule that not only limits participation in union affairs to members in good standing but precludes a class of members those on layoff from fulfilling an essential prerequisite payment of dues to maintain their good standing. The result is that members on layoff are barred from participating in all union matters regardless of their willingness to pay dues or the extent to which the union matters may compromise, or as here, nearly extinguish, their rights. We reach a more limited issue: the reasonableness of the application of the good standing provision to preclude laid-off employees from voting on the alteration of their recall rights.[6]
 
 
 14
 The Supreme Court has indicated that the test of reasonableness under Title IV of the Act (which deals with the election of union officers) (section 411 is a part of Title I) is a balance between the "anti-democratic effects" of the challenged rule and the "(union) interests urged in its support." United Steelworkers v. Usery, 429 U.S. 305, 310, 97 S.Ct. 611, 615, 50 L.Ed.2d 502 (1977). Since the good standing rules are challenged here as applied to bar a group of members from voting, we see no principled reason why that test should not also guide our inquiry in this case.
 
 
 15
 Against that background, we are reminded by the union of the policy against judicial interference in the internal affairs of unions. Local 657, United Brotherhood of Carpenters v. Sidell, 552 F.2d 1250, 1254 (7th Cir.), cert. denied, 434 U.S. 862, 98 S.Ct. 190, 54 L.Ed.2d 135 (1977); Rota v. Brotherhood of Railway, Airline & Steamship Clerks, 489 F.2d 998, 1003 (7th Cir. 1973), cert. denied, 414 U.S. 1144, 94 S.Ct. 896, 39 L.Ed.2d 99 (1974). Therefore, we approach our resolution of this issue fully conscious of, and with respect for, the interests that underlie that policy. Generally, internal union matters should be left to the union and its members. We have no desire to try to constitute this court as an "ex officio" union member with powers not accorded actual union members.
 
 
 16
 In Williams v. Typographical Union, 423 F.2d 1295 (10th Cir.), cert. denied, 400 U.S. 824, 91 S.Ct. 47, 27 L.Ed.2d 53 (1970), the tenth circuit considered the reasonableness of a union constitutional provision that barred members classified as "not working at the trade" from voting on any and all union matters. A union member employed on a full-time basis in another field challenged his disfranchisement. Despite the broad ambit of the challenged union rule, the court limited inquiry to the rule's application to voting on wage scales. Since "those not primarily dependent on the printing business for their livelihood . . . do not have the vital interest in wage scales which is present in those who are first and foremost printers . . . (w)e believe that the regulation is reasonable and does not violate the Act." Id. at 1298.
 
 
 17
 Unlike the attenuated interest of the plaintiff in Williams, the interest of laid-off workers in matters that will alter or effectively extinguish their recall rights is a most vital one. Recall rights represent the laid-off employees' only hope of once again pursuing their livelihood in the company where they have been employed and have acquired a degree of seniority. The Local represented both Tube and Motor employees but those employees had interests that as events transpired became antagonistic. The good standing provision permitted the Motor employees to take over the transaction of Local business at a critical time, to exclude the laid-off Tube employees from attending the meeting at which their vital interests were placed in jeopardy, and to strip the excluded Tube employees of their recall seniority. The only employees adversely affected by the vote that occurred at the closed meeting were those who were excluded. Yet, they not only could not vote on a matter of utmost concern to them, they could not even be heard on the merits of the issue.
 
 
 18
 The union submits a number of grounds that it contends demonstrate the reasonableness of the application of the good standing provision to the laid-off Tube employees. First, the union points out that the provision was adopted at its 1972 International convention and ratified by the membership, and therefore was not fashioned specifically for the Tell City situation. We are unconvinced that this argument has any relevance because, assuming its verity, this suit challenges not the bare rule, but its application to preclude from voting those members whose vital interests are most directly affected. The good standing provision becomes oppressive in this case when combined with the union's rule that a laid-off member is not required to pay dues and therefore cannot voluntarily retain his good standing by paying dues. It is no defense that the rules may have been democratically adopted by the membership when the rules in combination are undemocratically applied.
 
 
 19
 The union next seeks to justify the good standing provision on the ground that it was necessary to eliminate inconsistent provisions among the various locals. The need for uniformity, however, is analytically empty for our purposes because virtually any rule imposed by a parent union even rules improperly based on race, sex or religion would include the characteristic of uniformity. That the good standing provision may yield uniformity among the locals has merit under section 411(a)(1) only if reasonable. That provision would be no more nor less uniform if it instead provided that temporary layoff from employment shall not deprive a member of his equal right to participate in the democratic processes of the union.
 
 
 20
 The union's interest in ensuring that employed members retain control over union affairs has some appeal. Concededly, the rule advances that interest. Implicit in this rationale is the notion that employed members have different interests than those of laid-off members. It does not follow, however, contrary to the union's suggestion, that the difference in interest on some matters necessarily justifies depriving the laid-off members of the right to vote on all matters including those of vital concern to them.[7] The arguments the union makes that may be applicable to retired employees are not transferable to laid-off employees because of the obvious differences in status. Retired employees are not involved in this case.
 
 
 21
 We are further guided by our perception of the gross unfairness of the application of the good standing provision in the circumstances of this case. We agree that "(a) union's discrimination against its members is most obvious, of course, when it denies some of them the right to vote outright." Bunz v. Moving Picture Machine Operators' Protective Union, 567 F.2d 1117 (D.C.Cir.1977). That obvious discrimination is most invidious where, as here, it is applied to prevent a group of members from voting or even speaking on matters that vitally affect them. The application in this case of the union provisions permitted some union members to benefit and protect themselves at the expense of other members of the same union while they were temporarily laid-off. Whenever the laid-off employees might be recalled and again become dues paying members in good standing there would be nothing left of the recall rights to vote on because the harm would have all been done during their temporary absence.
 
 
 22
 The language in section 411 that guarantees to union members equal rights subject only to reasonable rules is not lifeless statutory window dressing. That provision declares that an inconsistent constitutional or bylaw provision shall be of no force or effect. Accordingly, the good standing provision as applied by the union to preclude laid-off members from voting on matters affecting their recall rights is of no force or effect. In reaching that conclusion we intend to cast no shadow of bad faith on the union for adopting the particular constitutional provisions. Nor do we intend to infer any view of the merits of one recall procedure over another as that is not for us to determine. We reverse on this issue and remand to the district court for consideration of appropriate relief.
 
 II. Duty of Fair Representation
 
 23
 The jury verdict on this issue in favor of the union and General Electric is challenged by plaintiffs only on the basis of some of the jury instructions. There is no dispute among the parties that the union's duty of fair representation "includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." Vaca v. Sipes, 386 U.S. 171, 177, 87 S.Ct. 903, 910, 17 L.Ed.2d 842 (1967). The scope of that duty, however, is not so broad as to preclude the union neither from taking "a good faith position contrary to that of some individuals whom it represents nor . . . supporting the position of one group of employees against that of another." Humphrey v. Moore, 375 U.S. 335, 349, 84 S.Ct. 363, 371, 11 L.Ed.2d 370 (1964).[8]
 
 
 24
 The parties part company at this juncture. Over plaintiffs' objection, the court gave Instruction No. 3 to the effect that a labor union is a legal entity, like a corporation, and as such, acts only through its officials and agents according to ordinary principles of agency.[9] Along with the instructions, the court submitted Special Verdict Question No. 1, which required the jury to make an express finding of fact on the question whether the union breached its duty of fair representation by proposing and adopting the recall procedure modification.[10] After about five hours of deliberation, the jury submitted its own question to the court:
 
 
 25
 Does question number 1 concern the mechanics of the bargaining committee presenting the proposal to the company, or does it concern the total action of the union membership in voting on and presenting the proposal to the company? Note: This question arises from Instruction 3, paragraph 2.
 
 
 26
 Over plaintiffs' objection, the trial court answered the jury inquiry with this additional instruction:
 
 
 27
 Question 1 concerns the official actions of Local 805, through its officers and agents who were members of its bargaining committee, in performing the acts described in the question. It does not concern the action or vote of the union membership on October 6th, 1974.
 
 
 28
 Plaintiffs' objection is particularly directed to the last sentence of the supplemental instruction, which divorces from the case any consideration of the heated October 6, 1974 meeting at which the controversial recall resolution was adopted. The objection was a continuation of plaintiffs' original objection to Instruction No. 3 on the basis that it failed to instruct that in addition to acting by its officers and agents the union could act by its members.
 
 
 29
 The meeting from which the Tube employees were excluded was convened pursuant to the International constitution provision for calling special Local meetings upon petition of ten percent or more of the membership. The president of the Local chaired the meeting but relinquished the chair to speak against the proposal. Under the applicable rules of order he was not permitted to resume the chair for the remainder of the meeting. The Local vice-president then took the chair but relinquished it shortly to add her voice to those speaking against the proposal. She too could not thereafter resume the chair. At that point, a Motor employee took the chair and a vote was taken by secret ballot. The proposal passed overwhelmingly. Three days later at a regular bargaining session three union officials presented the proposal that the membership had passed to General Electric.
 
 
 30
 The union in support of the supplemental instruction argues that the instruction properly limited jury consideration to the acts of the Local's officers and bargaining committee without regard to the events of October 6, 1974.[11] The union fairly concedes that the jury could have found on the evidence presented that individual members employed at Motor were motivated, at least in part, by hostility to the interests of Tube employees, and that if the union officials were similarly motivated, those motivations could serve as a basis for a finding that the union breached its duty of fair representation. On the other hand, the union points out that the principal union officers spoke vigorously against the proposal, which demonstrates, assertedly, that the union leadership was not motivated by animus towards the Tube employees.
 
 
 31
 We agree with the union that the essence of the duty of fair representation is that the union cannot carry out the majority will at the expense of the minority if to do so would be arbitrary, discriminatory or in bad faith and with the view expressed in Tedford v. Peabody Coal Co., 533 F.2d 952, 956-57 (5th Cir. 1976):
 
 
 32
 The major goal of the duty of fair representation is to identify and protect individual expectations as far as possible without undermining collective interests. Where the individual and collective group interests clash, the former must yield to the latter. When collective bargaining agreements are executed, there may be many provisions which lead individual employees to believe they are entitled to specified benefits but, in the final analysis, the collective group interests must remain paramount. The nature of any labor policy requires an election between preserving the group interests through democratic processes and adopting external restraints to protect the minority. (footnotes omitted)
 
 
 33
 A union is necessarily permitted to resolve a conflict on any reasonable basis if its decision is based on legitimate differences among its members and is undertaken in good faith and with honesty of purpose. Ford Motor Co. v. Huffman, 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953). Thus the union officers and bargaining committee lawfully could follow the dictates of the majority if they determined in good faith that the decision reflected a proper resolution of conflicting but legitimate interests. But the union by its officers cannot accede to the majority if to do so would result in arbitrary, discriminatory or bad faith disregard for the rights of the minority. The union claims in the application of these accepted principles, and we agree, see note 11 supra, that the evidence did not demonstrate that the majority will[12] expressed at the October 6, 1974 meeting directly controlled the official union action since the union acted through the independent judgment of its officials in negotiating the proposal with General Electric. We likewise agree with the union that the issue for the jury was whether the union officers exercised their responsibilities in accordance with the duty of fair representation.
 
 
 34
 We part with the union, however, on the effect of the wording of the supplemental instruction. In our view, the last sentence of the instruction departed from the foregoing principles. That sentence categorically states that the duty of fair representation issue "does not concern the action or vote of the union membership on October 6, 1974." In that respect, the supplemental instruction was critically misleading. The jury should have been allowed to consider that emotional meeting, the heated words expressed on both sides, and the underlying antagonism between Motor and Tube employees, to the extent that it all may have served to override the contrary views that the officials expressed at the meeting. These statements of the officials, which the union relies on, we note, were expressed before the membership voted. The determination of whether the officials subsequently acted arbitrarily, discriminatorily or in bad faith or subjugated their own judgments to majority hostile pressures cannot fairly be made by the jury if it labors under the misconception that even for these limited purposes the jury is not to be concerned with the action or vote of the membership at the meeting. The events that transpired on October 6, 1974 are a part of the political process that may have helped produce the subjugation of one group's interests in favor of another group's interests. To ask a jury to determine whether a union official acted contrary to his duty by presenting a proposal for negotiation without reference to the origins of the proposal puts unnecessary and misleading blinders on the jury. We find no fault with the other instructions, but we believe the good instructions were severely undercut at a critical time in the deliberative process by the misleading supplementary instruction. We will not try to weigh the evidence on both sides of the merits of the issue as that is for a jury to do under proper instructions.
 
 
 35
 We do not find, however, that the error in the supplemental instruction is as pervasive as plaintiffs suggest. The power under the local union constitution of ten percent of the membership upon petition to convene a special meeting does not carry with it the power to bind the Local by any action taken at the meeting. Action taken at a special meeting does not serve to relieve the officers of their responsibilities. Accordingly, the jury may consider the events of October 6, 1974 but only for the limited purposes outlined above.
 
 
 36
 In light of the foregoing, we reverse and remand for a new trial on this issue. That disposition must necessarily apply also to General Electric. The court below properly instructed the jury to examine General Electric's possible collusion with the union only if it first found that the union breached its duty of fair representation.
 
 
 37
 III. Alleged Breach by General Electric of the
 
 
 38
 Anti-Discrimination Clause of the National Agreement
 
 
 39
 The National Agreement between the Union and General Electric provided that General Electric would not discriminate against any employee on account of age or sex. Plaintiffs contend that General Electric in accepting the union's recall modification proposal was motivated by a desire to discriminate against female and older employees and not by legitimate nondiscriminatory business considerations. The trial court directed a verdict on this issue. We affirm.
 
 
 40
 There are numbers of people of both sexes and a wide variety of ages among both the Tube employees and the Motor employees. Women and persons over age forty appear in higher proportions among the Tube employees. Conceivably General Electric may have been motivated to accept the union proposal by a judgment that the modification of recall rights would result in fewer female employees and fewer employees over age forty than if the old formula were followed.
 
 
 41
 Nevertheless no class or subclass was defined in terms of age or sex. The complaint alleges no age or sex discrimination in violation of the National Agreement. The issue was injected only by letter in response to a pretrial order to specify the alleged breaches of fair representation and of contract upon which plaintiffs would rely at trial to show that the recall modification was made in bad faith. In the context of this case under the present complaint, evidence of age or sex discrimination is admissible for that purpose only but not to constitute a separate cause of action for breach of the anti-discrimination clause of the National Agreement.
 
 
 42
 Affirmed In Part; Reversed And Remanded In Part.
 
 
 
 [1]
 This appeal arises from the consolidation of two separate complaints filed by different classes of present and former employees at General Electric Company's manufacturing facility in Tell City, Indiana. The second class of plaintiffs was the beneficiary of the revised seniority system challenged here on appeal by the first plaintiffs class. The issues raised by the second class at trial were not appealed to this court and accordingly shall not be discussed in this opinion
 
 
 [2]
 Reference to the "union" includes both the International and the Local
 
 
 [3]
 By 1976 Motor began to recall some former Tube employees under the new recall procedure. Once recalled, a former Tube employee had the full benefit of his General Electric seniority for all purposes including promotion, shift preference, future layoffs and recall. Some Motor employees then circulated a petition for another special meeting to revoke the seniority of former Tube employees that accrued prior to their recall to Motor. This last proposal was ruled illegal by the union and never came to a vote
 
 
 [4]
 29 U.S.C. § 411 provides in pertinent part:
 (a)(1) Equal rights. Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.
 (b) Any provision of the constitution and bylaws of any labor organization which is inconsistent with the provisions of this section shall be of no force or effect.
 Jurisdiction for a civil action alleging a violation of the Act is provided in 29 U.S.C. § 412:
 Civil action or infringement of rights; jurisdiction. Any person whose rights secured by the provisions of this subchapter have been infringed by any violation of this subchapter may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate. * * *
 
 
 [5]
 The requirement in section 402 that expulsion or dismissal be pursuant to "appropriate proceedings" is an apparent reference to 29 U.S.C. § 411(a)(5), which reads:
 Safeguards against improper disciplinary action. No member of any labor organization may be fined, suspended, expelled or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.
 Nonpayment of dues is excepted from the requirement that suspension, expulsion or other discipline be undertaken only pursuant to "appropriate proceedings." That exception, however, does not preclude our finding that the laid-off Tube employees remained "members" of the union within the meaning of the Act because they were neither expelled nor suspended but rather were prevented by the union from paying their dues. They were merely excluded from participating or voting at the October 6, 1974 meeting. Furthermore, even if they had been suspended or expelled, they would still remain members because section 402 recognizes such proceedings only when undertaken pursuant to lawful constitutional or bylaw provisions. As our discussion at pp. 1285-1287 infra indicates the relevant constitutional provisions cannot be so characterized.
 
 
 [6]
 The union suggests as a practical matter considering the actual vote at the controversial meeting that had all of the excluded employees been permitted to vote and had voted in their self-interest, the end result would have been the same. We note that the laid-off employees were barred from even attending the meeting and therefore could not speak out against the proposal. It is pure speculation to suggest that the presence of the very employees whose rights were being compromised might not have changed the result
 
 
 [7]
 Plaintiffs also find support for their position in certain Department of Labor interpretive regulations promulgated under Title IV of the Act (§ 411 is a part of Title I) that provide that a laid-off employee may maintain good standing for the purpose of remaining eligible to vote on union matters by tendering dues, which the union cannot refuse to accept. 29 C.F.R. §§ 452.86 & 452.92. The trial court held these regulations to be unreasonable, which prompted the Secretary of Labor to intervene as amicus curiae
 The trial court suggested that the Title IV regulations were unreasonable as they might permit fraudulent manipulations by union officers to affect their own election. But that speculation pales when compared with the certain inequity that befalls the member temporarily excluded due to layoff if some of the basic justifications for those rules are not found to have some relevance to Title I. Otherwise some more fortunate union members could take advantage of the temporary troubles besetting other union members.
 Congress did not delegate any rulemaking authority to the Secretary under the Act. The regulations are therefore merely "interpretive." Even when applied to a Title IV problem, they would not necessarily bind this court but would ordinary be entitled to consideration. Skidmore v. Swift & Co., 323 U.S. 134, 139-40, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944). We do not attempt to apply the Title IV interpretive regulations to this Title I case, but unlike the trial court we find that some of the underlying justifications for the regulations are fundamental and provide guidance in areas beyond Title IV. If, for instance, an informed employer desired to influence anticipated union business, he might otherwise have the power to manipulate his work force through selective layoffs and thereby suspend or terminate the rights of particular union members to participate and vote. Furthermore, the regulations recognize that members temporarily laid-off from employment may retain an active interest in the union. The union may, of course, test the genuineness of that interest by the willingness of the laid-off member to pay dues during the period of layoff. The regulations also recognize the propriety of limiting participation in union affairs to those whose identification with the trade gives them a genuine interest in the matters put to a vote under Title IV, the election of officers. Thus, the union is free to exclude retirees from voting. 29 C.F.R. § 452.93. However, the permanence of retirement precludes continued strong interest on a number of matters. Those on temporary layoff retain an interest in the conditions of employment to which they hope to return. That hope crystallizes the interest.
 A goal of Title IV is to "protect the rights of rank-and-file members to participate fully in the operation of their union through processes of democratic self-government, and, through the election process, to keep the union leadership responsive to the membership." Wirtz v. Local 6, Hotel Employees, 391 U.S. 492, 497, 88 S.Ct. 1743, 1747, 20 L.Ed.2d 763 (1968); see United Steelworkers v. Usery, 429 U.S. 305, 97 S.Ct. 611, 50 L.Ed.2d 502 (1977). Title I should not be applied in a manner that contravenes the purpose of Title IV, particularly, as here, where voting rights are implicated.
 
 
 [8]
 Nor do the parties dispute in general the application of the duty of fair representation to the facts of this case as set forth in the following instructions given without objection:
 Instruction No. 7:
 It would be improper for a local union to offer to change contract practices of long standing arbitrarily, for the sole purpose of benefiting a stronger, more politically favored group over a minority segment of the union.
 On the other hand, if there are reasoned and logical purposes for making a change in such practices, based on all of the facts in evidence and free of hostile discrimination, the mere fact that such a change may benefit some or all of a majority group to the disadvantage of the smaller group would not constitute a breach of the duty of fair representation.
 Instruction No. 9:
 It is not unlawful for a union and a company to make an agreement which adopts a system of recall rights different than the system that was used in the past. Recall rights, like all other aspects of seniority, are the product of collective bargaining. They have no legal existence outside a collective bargaining agreement, and they can be changed by a company and union through the collective bargaining process. In proposing or agreeing to an adjustment in recall rights, a union is permitted a wide range of reasonableness within which it can act. A union does not violate the duty of fair representation it owes the employees it represents even if the adjustment of recall rights works to the advantage of one group of employees and to the disadvantage of another group unless its conduct is based on hostile discrimination or undertaken for arbitrary reasons unrelated to relevant differences between the two groups of employees affected by the adjustment.
 For a recent thorough overview of the law in this area, see Leffler, Piercing the Duty of Fair Representation: The Dichotomy Between Negotiations and Grievance Handling, 1979 U.Ill.L.F. 35 (1979).
 
 
 [9]
 Instruction No. 3 reads:
 The Company is a corporation and can act only by its officers, agents, servants or employees. Therefore, whenever mention is made of the Company doing or not doing anything, then of course it means the corporation or any of its officers, agents, servants or employees, acting within the scope of their employment or authority.
 Likewise, Local 805 and the International Union are labor organizations and can act only by their officers or agents. Therefore, whenever mention is made of such defendants doing or not doing anything, then of course it means the labor organizations or any of their officers or agents, acting within the scope of their employment or authority.
 
 
 [10]
 Special Verdict Question No. 1 reads:
 
 
 [1]
 Did the actions of Local 805 in proposing to the Company the "Motors First" contract modification adopted at the meeting of October 6, 1974, and in signing the Local Supplement containing such modification on June 18, 1975, violate the Local's duty of fair representation toward the Tube class of plaintiffs
 
 
 [11]
 We agree with the union that the acts and statements of the membership at the October 6, 1974 meeting are not attributable to the union officials who spoke against the proposal and the members of the bargaining committee who presented the proposal to General Electric. This case presents the converse of the circumstances presented in Barton Brands, Ltd. v. N.L.R.B., 529 F.2d 793 (7th Cir. 1976). In that case, we declined to attribute to the union the bad faith motivation of a union official where the union membership concededly initiated and passed a similar "end-tailing" proposal without improper animus. The result plaintiffs here seek affirmative attribution of rank-and-file motivation to union officials is a far step from Barton Brands and a step we decline to take. Plaintiffs' further suggestion that ordinary principles of agency require us to attribute the motivations of the rank-and-file to the union flies in the face of the union's entity status
 
 
 [12]
 In view of our finding on the Landrum-Griffin Act claim, see Part I supra, this characterization of the will of those voting as being the will of the majority may be inaccurate. See note 6 supra