John D. SERGEANT, Plaintiff–
Appellant,

v.

INLANDBOATMEN'S UNION OF THE
PACIFIC, an incorporated association,
Defendant–Appellee.

No. 02–15957.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 18, 2003.

Filed Oct. 17, 2003.

John Sergeant, Pro Se.

Dmitri Iglitzin, Schwerin, Campbell, Barnard, LLP, Seattle, Washington, for the appellee.

Before: REINHARDT, SILER,* and HAWKINS, Circuit Judges.

REINHARDT, Circuit Judge:

## I

John Sergeant is a "casual" ticket agent at the Golden Gate Bridge and a member of the Inlandboatmen's Union of the Pacific ("IBU" or "Union"). The IBU represents the ticket agents employed by the Golden Gate Bridge, Highway, and Transportation District Ferry Transit Division ("the Bridge"). The terms of the ticket agents' employment at the Bridge are governed by a collective bargaining agreement called the Memorandum of Understanding. The bylaws for the San Francisco Region of the IBU—the IBU division in which the Bridge is located—include a provision that restricts participation in the ratification of collective bargaining agreements to those members who are "directly involved." For more than twenty years, the IBU has interpreted this provision to mean that certain Bridge casual employees known as non-seniority casuals are not permitted to vote on labor-management contracts.

Because Sergeant is a non-seniority casual employee, he was not eligible to vote on the most recent collective bargaining agreement between the Union and the Bridge. The agreement materially altered the way in which non-seniority casuals are selected and increased the number of regular part- and full-time ticket agent positions available at the Bridge, in order to regularize the workforce and limit the need to rely on non-seniority casuals, who are less likely to be available for work.

Sergeant sued the Union asserting that the rule that prevented non-seniority casuals from voting on the Memorandum of Understanding violated Section 101(a)(1) of the Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 411(a)(1), which guarantees equal voting rights to all members, subject to "reasonable rules and regulations." The district court granted summary judgment in favor of the Union. Sergeant appealed. We affirm.

## II

Ticket agents have the option of joining the IBU after they are cleared to perform work for the Bridge. The wages and working conditions of all ticket agents, regardless of union membership status, are governed by a collective bargaining agree-

* The Honorable Eugene E. Siler, Circuit Judge, United States Court of Appeals for the Sixth Circuit, sitting by designation.

ment, the Memorandum of Understanding. The agreement divides ticket agents into four classes:

1. *Regular Full–Time Ticket Agents:* employees who hold permanent full-time ticket agent jobs with Golden Gate.

2. *Regular Part–Time Ticket Agents:* employees who hold permanent part-time positions. These agents work every week but do not work a full 40–hour week. Like full-time agents, they are required to report for work at scheduled times and can be terminated or otherwise disciplined if they do not.

3. *Seniority Casual Ticket Agents:* employees who work 60 days within a consecutive 90 calendar-day period. These agents have preference over non-seniority casual ticket agents for temporary job opportunities of at least one week's duration. Additionally, if a regular position becomes available, it must be offered to a seniority casual agent, who must then accept the position or lose his seniority status.

4. *Casual Ticket Agents:* employees who work on a temporary basis and do not meet the seniority casual requirements. These agents are offered available work based on their rank on a list and generally work for one-day periods.

The Union considers employees in the first three categories to be seniority employees or "seniorities." Those in the fourth category are referred to as "non-seniority casuals." Sergeant is a non-seniority casual. All ticket agents, regardless of classification, are required to pay a $600 initiation fee to become union members. In addition to the initiation fee, non-

seniority casuals who work over 24 hours per month pay the same monthly dues as seniorities. Sergeant paid the $600 initiation fee, as well as monthly dues during the occasional months in which he worked over twenty-four hours. Although non-seniority casuals have equal electoral rights within the Union in most other respects (e.g. with respect to electing officers and running for office), only seniorities are allowed to vote on collective bargaining agreements.

On June 30, 2000, the Memorandum of Understanding between the Bridge and the Union expired. The parties negotiated a successor agreement. In order to limit the need to rely on non-seniority casuals as substitutes and to regularize the workforce, the agreement increases the number of regular full-and part-time positions available and creates a hiring point system for non-seniority casuals.[1] Under the old agreement, non-seniority casuals could turn down work offered to them without penalty. Under the new contract, non-seniority casuals gain a point for every day worked, and lose a point every time they either decline a work assignment or fail to respond within fifteen minutes to a supervisor's call offering an assignment. If a non-seniority casual's points sink below negative fifteen, he may be dropped from the dispatch list. The point system does not apply to seniority casuals; once a non-seniority casual obtains seniority status, the only way he can lose that status is by turning down an offer for part- or full-time employment.

Under the IBU San Francisco Region[2] bylaws, a collective bargaining agreement

---

**1.** Other changes include: a 2–day decrease in the number of days all employees were allowed "death in the family" leave, a $2.00 increase in the amount of money allotted for a meal allowance for employees that work in excess of eight hours on any day, a provision allowing permanent part-time employees to

receive overtime pay, and the addition of a shipwreck compensation provision. With the exception of the overtime provision, all of the aforementioned changes affect casuals.

**2.** The IBU's constitution provides that "the Union is a single entity, national in scope."

becomes effective only upon ratification by a vote of the eligible Union members. As applied over the past two decades, eligible members consist of the Bridge's seniorities only. Non-seniority casuals are excluded from contract ratification votes on the basis of the following provision: "All agreements, prior to signature, must be ratified by the Union members *directly involved.*" (emphasis added). At the time the briefs in this case were filed, eleven of the twenty-two ticket agents at the Bridge were non-seniority casuals; thus, fifty percent of persons who perform work as ticket-takers at the Bridge were excluded from voting on the agreement.

The IBU concedes that the effect of the rule appears to be undemocratic on its face, but argues that it is nevertheless reasonable. As the IBU emphasizes, the record contains essentially uncontested evidence that because of the steady and reliable demand for substitute workers, any non-seniority casual ticket agent can gain seniority status, and, therefore, full voting rights, simply by making himself available for work. A non-seniority casual can become a seniority casual by working 60 days within a 90–day calendar period, and there is enough work available during any given year for any employee interested in attaining seniority status to meet the seniority requirement. Once an employee attains seniority casual status, the only way he can lose that status is if he refuses a part- or a full-time position. Thus, there is no reason why a casual employee cannot obtain permanent, full voting rights status if he wishes to commit himself to performing more than occasional work for the employer. Sergeant conceded as much in his briefs and at oral argument. In fact, the Bridge and the Union gave Sergeant the opportunity to attain seniority status on two separate occasions within a year of the

election, by accepting either of two part-time positions, and he chose not to do so.

The Union further asserts that under the bylaws the interests of non-seniority casual employees are not "directly" at stake because these casuals have no real commitment to the job and no real obligations to the employer, the Union, or their fellow members. The undisputed evidence shows that non-seniority casuals worked far fewer hours on the average than seniorities, were not obligated to accept work when it was offered to them, and were free to accept seniority positions with other maritime employers, unlike the Bridge's seniority employees. Non-seniority casuals could simply maintain their names on the work-list and accept work if and when they chose. Overall, the Union's San Francisco Regional Director stated, non-seniority casuals have "less of an investment in the continuing functioning of the Bridge as an active, successful and operational employer." It was primarily this "minimal investment" that led the Union to conclude that non-seniority casuals are not "directly involved," and thus should not be allowed to vote on ratification of collective bargaining agreements. In this regard, the Union stated that it feared that casuals might "dilute, and potentially . . . overrule, the votes of seniority employees whose fundamental economic and job security is primarily at issue."

Six days after the negotiation concluded, the members of the Union eligible to vote on the contract ratified the July 5th Memorandum of Understanding. As stated, Sergeant and other non-seniority casuals were not permitted to vote. Sergeant brought the present action *pro se* alleging that the Union violated section 101(a)(1) of the LMRDA, 29 U.S.C. § 411(a)(1), by denying him the right to vote. He also

Although the IBU is divided into geographic divisions for purposes of representation, the

Regions are not autonomous organizations within the national structure.

asserted a breach of contract claim pursuant to section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. 185(a), alleging a violation of an agreement between the San Francisco Region and the IBU. He sought compensatory and punitive damages for economic and emotional harms, as well as injunctive relief precluding enforcement of the agreement and requiring the Union to allow him and similarly situated Union members to vote on the ratification of future agreements.

The Union moved for summary judgment, and Sergeant sought partial summary judgment as to liability. The district court granted the Union's motion and denied Sergeant's. The court also determined that it did not have subject matter jurisdiction over the breach of contract action. Sergeant appeals only the portion of the judgment relating to the alleged LMRDA violation.

### III

■ Whether a union can adopt rules excluding a portion of its members from voting on the ratification of a contract affecting their employment under the LMRDA, is a question of first impression in this Circuit.[3] We examine this issue in light of the well-established federal policy of avoiding unnecessary interference in the internal affairs of unions and according considerable deference to the interpretation and application of a union's rules and regulations. *Motion Picture & Videotape*

*Editors Guild, Local 776 v. Local 695, Int'l Sound Technicians,* 800 F.2d 973, 975 (9th Cir.1986), *amended by* 806 F.2d 1410 (9th Cir.1986).

■ The LMRDA provides that "[e]very member of a labor organization shall have equal rights and privileges within such organization ... to vote in elections or referendums of the labor organization ... subject to *reasonable rules and regulations* in such organization's constitution and bylaws." § 101(a)(1), 29 U.S.C. § 411(a)(1) (emphasis added).[4] Any provision of a union's constitution or bylaws "which is inconsistent with the provisions of this section shall be of no force or effect." § 101(b), 29 U.S.C. § 411(b). In determining whether a union has violated section 101(a)(1), a court must first consider whether the union rule conflicts with a right guaranteed by the section; if so, the court must then determine whether the rule is reasonable nonetheless. *Zamora v. Local 11, Hotel Employees and Rest. Employees Int'l Union,* 817 F.2d 566, 569 (9th Cir.1987).

We agree with the parties that the Union's rule prohibiting non-seniority casuals from participating in contract ratification voting would conflict with the equal voting rights provision of the Act in the absence of a reasonable rule authorizing the voting limitation. Because the Union has maintained a rule prohibiting voting by casuals on collective bargaining agreements for

---

**3.** We have addressed the issue of voter eligibility under the LMRDA, but only in the context of elections of union officers. In *Donovan v. Sailors' Union of the Pacific,* 739 F.2d 1426 (9th Cir.1984), we invalidated a union rule excluding from such elections those who had been union members for less than three years. *Id.* at 1430. However, although *Donovan* cited section 101(a)(1), it based its holding exclusively on section 401(e), 29 U.S.C. § 481(e), which pertains particularly to the election of officers. *Id.* at 1431.

**4.** In full, section 101(a)(1) provides:

(a)(1) Equal rights. Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

many years, the only dispute is whether the Union rule is reasonable.[5]

 First, it should be noted that the right to vote guaranteed by subsection 101(a)(1) is not a substantive grant of voting rights. The provision itself accords no right to vote on any matter to union members. Rather, the provision requires *equal* voting rights: it requires that rights given to some members must be given to all, subject only to reasonable rules or regulations. *Stelling v. Int'l Bhd. of Electrical Workers, Local Union No. 1547*, 587 F.2d 1379, 1385 (9th Cir.1978). In determining reasonableness, we must balance the undemocratic effects of the challenged rule against the union interests urged in support of the rule. *Zamora*, 817 F.2d at 570; *cf. United Steelworkers v. Usery*, 429 U.S. 305, 310, 97 S.Ct. 611, 50 L.Ed.2d 502 (1977) (applying similar balancing test in interpreting reasonableness under LMRDA section 401(e), 29 U.S.C. § 481(e), concerning restrictions in elections for union officers).

Other circuits addressing denial of voting rights under section 101(a)(1) have analyzed reasonableness largely on the basis of whether the employee was excluded from voting on matters in which he had a vital interest, or whether, instead, the vote pertained to matters primarily of concern to those who were permitted to vote.

In *Williams v. Int'l Typographical Union*, 423 F.2d 1295 (10th Cir.1970), the Tenth Circuit considered the reasonableness under section 101(a)(1) of a regulation prohibiting union members classified as "not at the trade" from voting on wage scales. *Id.* at 1298. The plaintiff was classified as a member of the latter group

because he held a full-time job as a writer and was merely "moonlighting as a printer." *Id.* at 1296. Because "not at the trade" employees were "not primarily dependent on the printing business for their livelihood," the court found that they did not have a vital interest in wage scales. *Id.* at 1298. Thus, the court determined that the undemocratic effects of excluding from wage-scale votes those who "do not have the vital interest in wage scales which is present in those who are first and foremost printers" did not outweigh the Union's interests, and held that the regulation was reasonable. *Id.*

The Sixth Circuit applied a similar analysis in *Taylor v. Great Lakes Seamen's Union*, 701 F.2d 590 (6th Cir.1983), refusing under section 101(a)(1) to invalidate a union rule that excluded from union elections a worker who had voluntarily terminated his employment. *Id.* at 591. The court held that a regulation which "guarantees that internal union affairs will be governed by those whose interests are most at stake—workers presently employed in the steel industry"—is reasonable. *Id.* at 592.

In *Alvey v. General Electric Co.*, 622 F.2d 1279 (7th Cir.1980), the Seventh Circuit found that the undemocratic effects of a regulation precluding laid-off employees from voting on a recall proposal outweighed union interests. *Id.* at 1282. Recall rights were the laid-off employees' "only hope of once again pursuing their livelihood" in the company; laid-off employees were the only union members adversely affected by the vote from which they were excluded. *Id.* at 1285. The court found that the critical issue was the

---

**5.** After the district court determined that it did not have jurisdiction over Sergeant's breach of contract claim, he did not pursue that issue on appeal. Nevertheless, in his brief he contends that the Union's interpretation of its bylaws is an unreasonable construc-

tion (i.e. not supported by the language of the provision). Given the Union's consistent interpretation of the rule in question for more than a twenty year period, we would be hard pressed to find the construction unreasonable now, were the question properly before us.

exclusion of a class of union members from voting: "where as here, it is applied to prevent a group of members from voting or even speaking on matters that vitally affect them." *Id.* at 1287. Using the *Williams* "vital interest" test, the court found that the union members in *Alvey* had a vital interest in the outcome of the vote. *Id.* at 1285. The court contrasted the "attenuated" interest of the moonlighting printer in *Williams* with the "most vital" interest of laid-off electrical workers. *Id.* The court explained that the Union's interest in ensuring that employed members retained some control over union affairs was out-weighed by the rights of laid-off members—workers who sought to return to the jobs from which they were involuntarily laid off—to "vote on all matters including those of vital concern to them." *Id.* at 1286. Accordingly, the court found the denial unreasonable. *Id.* The Seventh Circuit's decision is in harmony with the NLRB's rule permitting laid-off workers to vote in representation elections when they have a "reasonable expectancy of recall."[6] *See, e.g., N.L.R.B. v. Adrian Belt Co.,* 578 F.2d 1304, 1308 (9th Cir.1978); *In re MJM Studios of New York, Inc.,* 336 NLRB No. 129, 134, 2001 WL 1627619 (2001).

▇ While we recognize that there is probably nothing more vital to a unionized employee than the collective bargaining agreement that regulates his employment relationship, as in *Williams* and *Taylor* the intent (and effect) of the IBU's policy is to ensure that the employees whose substantial interests are most at stake—those employees who are "first and foremost" Bridge ticket agents—will have the ability to determine the terms and conditions of their employment. Accordingly,

we believe that the undemocratic effects of the Union's rule excluding non-seniority casuals from voting on the ratification of collective bargaining agreements are outweighed by the Union's interests in protecting the members whose livelihoods are critically affected by modifications to the terms of collective bargaining agreements with the Bridge—those employees who take advantage of the opportunity to become seniority employees and whose primary employment interests lie with the Bridge.

The undisputed facts in this case disclose that non-seniority casuals have a relatively insubstantial interest in the outcome of contract ratification votes in comparison to seniorities. First, non-seniority casuals have historically worked substantially fewer hours than seniorities. Second, unlike seniorities, non-seniority casuals have been generally free to turn down work assignments. Third, the ability of non-seniority casual employees to refuse work offered to them has caused difficulties for seniorities, who may be unable to take vacation time or sick leave without casuals ready to substitute. Fourth, unlike seniorities, non-seniority casuals have been free to accept seniority positions with other maritime employers without suffering any adverse consequences.

Most important, seniority status employees depend on the stability of their positions as ticket agents for their economic security. As in *Williams,* the record here shows that non-seniority casual ticket agents, such as Sergeant, "moonlight" to earn extra income; in contrast to seniorities, employment at the Bridge is not the primary component in the non-seniority

---

**6.** Similarly, employees laid-off during an economic strike generally remain eligible to vote in representation elections for a one year period. *Bio–Science Laboratories v. N.L.R.B.,* 542 F.2d 505, 508 (9th Cir.1976); *Pepe's Inwood Packing Co., Inc.,* 206 NLRB 642, 653, 1973 WL 4960 (1973); NLRA § 9(c)(3), 29 U.S.C. § 159(c)(3).

casuals' efforts to secure their economic security or future financial well-being. In this regard, it is undisputed that all eleven non-seniority casuals turned down offers from the Bridge (pursuant to the new contract) to take positions as part- or full-time ticket agents. Thus, the distinction drawn by the IBU with regard to the provision of voting rights is between those employees for whom the job with the Bridge is a central feature of their lives and livelihood—who are "first and foremost" Bridge employees—and those for whom, as a class, that job is only a "casual" matter.[7]

In this regard, we emphasize the distinction between non-seniority casuals and laid-off employees, the union members the Seventh Circuit held entitled to vote on contract ratification in *Alvey,* 622 F.2d at 1285. Laid-off workers are victims of economic circumstances, of downturns in the country's or the employer's economic conditions, or of contemporary corporate cost-cutting practices, such as "downsizing" or "outsourcing." Laid-off employees, unlike non-seniority casuals, do not voluntarily forego the opportunity for regular employment with the employer-party to the collective bargaining agreement. To the contrary, they maintain their vital interest in regular employment during the lay-off period.

█ Although we conclude, along with the Sixth and Tenth Circuits, that a union may reasonably deny the right to vote on a collective bargaining agreement to those who voluntarily elect not to accept regular employment with the employer, we note that here fully half of the individuals performing ticket agent work at the Bridge are casual workers who are prohibited by the Union's rule from participating in the contract ratification process. Ordinarily, the disenfranchisement of so substantial a percentage of union members would tend to call a disqualifying rule into question. *See, e.g. Turner v. Dempster,* 569 F.Supp. 683, 691 (N.D.Cal.1983), *affirmed,* 743 F.2d 1301 (9th Cir.1984)(calling the exclusion of such a large percentage of the membership, one third in that case, "repugnant to Congressional intent" and holding that the exclusion was unreasonable). Here, however, the large percentage of casual workers has the opposite effect on our calculations. To permit so many individuals with so small an interest in the fundamental economic and employment issues affecting the Bridge and the Union to control the outcome of collective bargaining between the parties could well jeopardize the economic future of the seniority workers whose financial well-being and job security depend on the parties reaching a mutually acceptable agreement and on the inclusion in that agreement of terms that will adequately protect their fundamental interests. At the very least, affording the union's rules the deference to which they are entitled, we cannot say that the union's determination that the job interests of voluntary casuals are insufficient to warrant their being afforded a vote on the collective bargaining agreement is unreasonable.

For the foregoing reasons, the judgment of the district court is

**AFFIRMED.**

---

7. This is not a case where the voting exclusion is intended to protect long-time employees from challenges from a particular racial or ethnic group. If the facts suggested that the goal of the exclusion was to allow incumbent union leadership to prevent new minority groups or women from voting on contract ratification, our conclusion as to the validity of the exclusion would likely be different.