John SCHULTZ, et al., Plaintiffs-Appellants,

v.

OWENS–ILLINOIS INCORPORATED and District No. 9, International Association of Machinists and Aerospace Workers, Defendants-Appellees.

No. 81–1104.

United States Court of Appeals, Seventh Circuit.

Argued June 1, 1982.

Decided Dec. 22, 1982.

Frank E. Wallemann, St. Louis, Mo., for plaintiffs-appellants.

R. Jeffrey Bixler, Owens-Illinois, Inc., Toledo, Ohio, C.E. Heiligenstein, Belleville, Ill., for defendants-appellees.

Before CUDAHY and COFFEY, Circuit Judges, and GRANT,* Senior District Judge.

CUDAHY, Circuit Judge.

In a prior appeal, this court held that plaintiffs could state a claim for relief under section 301(a) of the Labor-Management Relations Act of 1947 (the "LMRA"), 29 U.S.C. § 185(a) (1976), for an alleged breach of the duty of fair representation by plaintiffs' union, District No. 9 of the Machinists' International Union (the "Union").[1] We also found that there was such a potential claim under section 301(a) against plaintiffs' employer, Owens-Illinois, Inc. ("Owens"), based upon Owens' alleged breach of contract involving rights in an apprenticeship program. *Schultz v. Owens-Illinois, Inc.,* 560 F.2d 849 (7th Cir.1977), *cert. denied,* 434 U.S. 1035, 98 S.Ct. 770, 54 L.Ed.2d 783 (1978) ("*Schultz I* "). Upon the remand of *Schultz I,* there was a jury trial, but the jury was unable to reach a verdict

---

* Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, is sitting by designation.

1. In their complaint, plaintiffs claim that the Union breached "its statutory duty of fair representation owing to plaintiffs under ... 29 U.S.C. § 414 et seq." Complaint ¶ 10. By way of clarification, we note that the duty of fair representation does not arise under 29 U.S.C. § 414 (1976), a provision concerning the rights of union members to receive copies of collective bargaining agreements, nor under any other provisions of the Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA"), which are codified near § 414. Rather, the union's duty to fairly represent its members is implied from § 9(a) of the National Labor Relations Act of 1935, 29 U.S.C. § 159(a) (1976), *see Humphrey v. Moore,* 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964); *Wallace Corp. v. NLRB,* 323 U.S. 248, 65 S.Ct. 238, 89 L.Ed. 216 (1944), and a claim alleging a breach of the duty of fair representation is cognizable under § 301(a). Although particular union conduct may violate both the duty of fair representation and the union's obligations under the LMRDA, *see, e.g., Aguirre v. Teamsters Union,* 633 F.2d 168 (9th Cir.1980), plaintiffs here have not satisfied either the procedural or substantive requirements for stating a cause of action under the LMRDA. We shall thus disregard plaintiffs' apparent reliance on 29 U.S.C. § 414 (1976).

and a mistrial was declared. The court then granted the motions of the two defendants for a directed verdict. *See* Fed.R. Civ.P. 50(b). The district court relied on several grounds, including lack of evidence of a breach of the duty of fair representation by the Union and of a breach of contract by Owens, as well as failure by plaintiffs to file timely grievances and an absence of proof of damages. Plaintiffs appealed and we affirm the directed verdicts in favor of both defendants.

## I. BACKGROUND

Although the opinion in *Schultz I* sets out much of the factual background of this case, *see* 560 F.2d at 851–53, we shall outline certain additional facts adduced at trial which we think relevant to the present issues.

Prior to certain 1971 collective bargaining sessions, both Owens and the Union interpreted a clause in their collective bargaining agreement establishing an Apprenticeship Training Program as requiring Owens to maintain a ratio of one apprentice for every eight journeymen machinists employed at Owens' plant in Godfrey, Illinois. The pertinent provision of this clause, which was not changed from 1968 to 1978, reads:

> The *normal* ratio of apprentices shall be one (1) apprentice to every eight (8) journeymen in the department. Apprentices shall serve for a period of 8,000 hours in accordance with the Federal Apprenticeship Standard Agreement. (Emphasis supplied.)[2]

Article 18 of the Federal Apprenticeship Standard Agreement covering the 1500 union shops encompassed within the Union's geographical jurisdiction, which is incorporated by reference in the collective bargaining agreement between the Union and Owens, provides in pertinent part that the

> [r]atio of apprentices to journeymen shall be in conformity with present or subsequent bargaining agreements between the employer and District No. 9. If provision of an employer's bargaining agreement does not specifically cover the subject of ratio of apprentices to journeymen, then the following shall apply.
>
> One (1) apprentice may be employed for each eight (8) journeymen.

During 1971, Owens became concerned about the number of journeymen machinists employed at the Godfrey plant and the high cost of maintaining a large number of employees in that classification.[3] In 1971, Owens had 200 journeymen out of a total work force of approximately 400—100 more journeymen than it could accommodate; this excess of journeymen apparently resulted from years of diligent adherence to the one-to-eight ratio prescribed in the apprenticeship program, combined with a low turnover rate. Consequently, many journeymen performed jobs requiring less than a journeyman's experience. But Owens was, of course, required to pay the higher journeymen's wage for such work.

To address the consequent inflated labor cost, Owens proposed to the Union during contract negotiations in 1971 that the language of the contract be changed so that the contract could not be interpreted to *require* Owens to maintain one apprentice for every eight journeymen (and as permitting Owens to reduce the number of entering apprentices). Owens submitted at least four proposals to the Union with regard to the apprenticeship ratio but the Union rejected each proposal. The Union did not want to change the contract language because similar language was used in numer-

---

2. In the collective bargaining agreement effective from 1978 to 1981, Owens and the Union modified the language in this clause to read: "The normal ratio of apprentices *may be* one (1) apprentice to every eight (8) journeymen in the department." (New language emphasized.) The new language is similar to the language used in the Federal Apprenticeship Standard Agreement. *See* text *infra.*

3. Apprentice machinists receive a sliding-scale percentage of the wage rate paid to journeymen, which depends upon an apprentice's total hours of employment experience; for example, a new apprentice with less than 1000 total hours experience is paid 58% of the journeymen's rate.

ous other collective bargaining agreements, and an alteration in the Union's contract with Owens would portend alterations in contracts with other employers. Nonetheless, the Union recognized the serious economic effect upon Owens of a strict application of the one-to-eight ratio. Therefore, the Union's chief bargaining representative and business agent, Wilbert Hemken, offered to contact the persons in charge of administering the apprenticeship program to determine whether Owens' concerns about the apparent mandatory nature of the apprenticeship ratio could be satisfied within the framework of the existing contract language.

Hemken approached Michael Harcourt, a representative of the Bureau of Apprenticeship and Training, United States Department of Labor, in November 1971, about the interpretation of this contract clause. Harcourt advised Hemken that the one-to-eight apprenticeship ratio clause contained in contracts bargained by the Union was discretionary and not mandatory; the ratio was to be applied by the employer, according to Harcourt, as adjusted to reflect its own needs for apprentices. Tr. at 783–87 (testimony of Mr. Harcourt). Hemken also contacted Fred Specman, Assistant Directing Business Representative for the Union's District No. 9, who supervised the negotiation and administration of more than 1500 labor contracts. Specman testified that the District No. 9 apprenticeship committee had informed Hemken that, of the more than 750 contracts containing comparable language, none was construed to impose on employers a mandatory apprentice-to-journeyman ratio. Tr. at 773, 776–78 (testimony of Mr. Specman). Hemken in turn reported this prevailing non-mandatory interpretation to the full Union negotiating committee at Owens' Godfrey plant. The committee then voted to accept this interpretation and to report its action to Owens. Tr. at 244 (testimony of Mr. Skelton). Based upon the understanding that the apprenticeship ratio was discretionary rather than mandatory, the Union negotiators and Owens agreed orally in November 1971 to leave the contract language unchanged.

A meeting of the Union membership at the Godfrey plant was held in December 1971 to ratify the proposed contract. Hemken testified at trial that he chaired this meeting and reported to the membership the interpretation of the existing apprenticeship clause agreed to by the Union negotiating committee and Owens. Tr. at 792. Several of the plaintiffs, on the other hand, testified that Hemken said nothing at the meeting about this new interpretation of the clause. However, each of the plaintiffs except one conceded on cross-examination that he could not recall whether the clause was ever discussed at the meeting. Tr. at 127 (testimony of Mr. Schultz), 164 (testimony of Mr. Baumann), 314 (testimony of Mr. Doran).

After the Union ratified the agreement reached in December 1971, Owens did not place any new apprentices in the apprenticeship program. At several of the monthly grievance meetings held in 1972, 1973 and 1974, the program, and the placing in it of new apprentices, were discussed. Both Owens' management and Hemken consistently maintained that the apprenticeship program had not been abandoned but that, pursuant to the oral understanding of November 1971, Owens could place new apprentices in the program on an "as needed" basis—and no new apprentices were currently needed. Although many of the plaintiffs became eligible (by virtue of seniority) for placement in the apprenticeship program during this period, no employees filed a grievance with the Union protesting Owens' failure to place them in the program.

The apprenticeship program was also an issue in 1974 during the next round of contract negotiations. The Union requested that the parties thoroughly review the existing apprenticeship program and asked that new apprentices be placed in the program. Although Owens agreed to discuss the program, its final and amended final offers to the Union retained the existing contract language. The Union rejected these final offers and called a strike. The main issues which apparently prompted the

strike, however, were wages, insurance and pensions; indeed, some of the plaintiffs were not even aware that the apprenticeship program was an outstanding unresolved issue at the time of the strike. *See, e.g.,* tr. at 523 (testimony of Mr. Coates), 539 (testimony of Mr. Warren). After seven weeks, the strike ended and a new collective bargaining agreement was ratified. This agreement retained the language of the existing apprenticeship clause.

Owens' interpretation of the contract clause relating to the apprentice-to-journeyman ratio as non-mandatory and Owens' failure to place new people in the apprenticeship program continued to be a cause of concern among some of the employees throughout 1974 and 1975. In April 1976, plaintiff John Schultz, an Owens employee, filed what was apparently the first formal grievance[4] involving the apprenticeship program. The grievance alleged that Owens breached the collective bargaining agreement by not maintaining a one-to-eight apprentice-to-journeyman ratio. Plaintiffs' App. at 30. By his own admission, Schultz had been qualified for appointment to the program for more than two years preceding the filing of the grievance. In any event, Hemken forwarded the grievance to Owens thereby initiating the contractual grievance procedure. David Bailey, Owens' Director of Industrial Relations, responded to the grievance by letter, stating in part:

> As a result of the 1971 Negotiations, the Company continued essentially the same language in the Apprenticeship Article, however, with a new understanding that the Company was no longer obligated to maintain any particular ratio. The Company then decided to not add any new apprentices to the program, and allow apprentices already on the program to finish the program. The last apprentice to complete the program was Arlin Schaefer, and he completed his training on May 22, 1975.

> We presently have 366 hourly employees in your Bargaining Unit. Of this total, 207 are master machinists, which represents 57% of our hourly workforce. The Company continues to have an oversupply of master machinists.

Plaintiffs' App. at 31.

Hemken then requested a face-to-face meeting with Bailey on the grievance, as authorized by the third step of the contractual grievance procedure. After this meeting, Hemken accepted Owens' response to the grievance and informed Schultz that he would not take the grievance to the last step of final and binding arbitration. In a letter to Schultz, Hemken explained his decision as follows:

> Does the Company have an obligation to maintain apprentices at all times with a ratio of one (1) apprentice to every eight (8) Master Machinists?

> The answer is; [sic] no, they do not have to maintain apprentices if there is no need for apprentices within the shop.

> The purpose of the ratio language is to retain the ratio for proper training and to have an adequate number of qualified journeymen ... available to properly train and instruct the apprentices ....

> Owens-Illinois or any other Company is not obligated to keep a work force for which there is no need for production or maintenance requirements.

Plaintiffs' App. at 34–35; *see* tr. at 808 (testimony of Mr. Hemken). No other employees qualified for the apprenticeship program, other than Schultz, filed a grievance. But in August 1976, shortly after Schultz received Hemken's letter accepting Owens' response to Schultz's grievance, this lawsuit was filed.

## II. THRESHOLD ISSUES

■ The district court, after declaring a mistrial, granted defendants' motions for directed verdicts. Thus, our standard of review is whether there was sufficient evi-

---

4. There was testimony at trial indicating that other grievances on the apprenticeship issue may have been filed but that records concerning such alleged grievances had apparently been lost or misplaced. We need not resolve any dispute on this point here because the filing of Schultz's grievance is sufficient to confer jurisdiction under § 301(a). *See infra,* § II.

dence upon which a jury could have entered a verdict for plaintiffs. *See* 9 C. Wright and A. Miller, *Federal Practice and Procedure* § 2524 (1971). We may not weigh the evidence or determine credibility; rather, to determine whether plaintiffs were entitled to have their case go to the jury, we must assess the evidence in the light most favorable to the plaintiffs.[5]

On appeal, both defendants have presented arguments (relating to the failure by most plaintiffs to file grievances and the alleged untimely filing of the Schultz grievance) which, if accepted, would preclude a suit against each of them under section 301(a) of the LMRDA. The Union also asserts that plaintiffs' suit is barred as to both defendants because the plaintiffs failed to exhaust intraunion remedies. Although these arguments are without merit, we need to address them in some detail here as they relate to our jurisdiction.

A. *Failure to File Grievances and Failure to File Timely Grievances*

The district court held that the plaintiffs other than Schultz could not maintain this suit against both Owens and the Union, under the principles announced in *Republic Steel Corp. v. Maddox,* 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965), because these plaintiffs failed to file grievances under the mandatory contract grievance procedure. Moreover, the court also found that Schultz had failed to comply with the collective bargaining agreement because his grievance was not filed within three working days of the challenged action as re-

quired by the contract, thus depriving the court of jurisdiction over the claims against both defendants under *Republic Steel.* Both defendants assert on appeal that the district court correctly applied the law to these undisputed facts.

■ Justice Harlan wrote in *Republic Steel* that "[a]s a general rule . . ., federal labor policy requires that individual employees wishing to assert contract grievances must *attempt* use of the contract grievance procedure" before requesting judicial intervention. 379 U.S. at 652, 85 S.Ct. at 616 (emphasis in original). But the rule of *Republic Steel* is not absolute. In *Glover v. St. Louis-San Francisco Railway,* 393 U.S. 324, 329–30, 89 S.Ct. 548, 551–552, 21 L.Ed.2d 519 (1969), Justice Black noted "that the exhaustion requirement is subject to a number of exceptions for a variety of situations in which doctrinaire application of the exhaustion rule would defeat the overall purposes of federal labor relations policy." One of these exceptions involves facts which show, as they did in *Glover,* "that a formal effort to pursue *contractual or administrative* remedies would be absolutely futile." 393 U.S. at 331, 89 S.Ct. at 552 (emphasis supplied).[6]

■ In the case before us, once Schultz's grievance was rejected, it would have been futile for the plaintiffs other than Schultz to have filed grievances.[7] This is not a case involving an individualized grievance where the Union, after reviewing the particular facts of another employee's claim, might decide to pursue that grievance after reject-

---

**5.** None of the parties has objected to the somewhat unusual procedural posture in which this case has been presented to us. By granting the motions for directed verdicts, the district court has determined that as a matter of law, there is no issue to be submitted to the jury (even though the court had previously submitted the case to the jury). In effect, the district court, after declaring a mistrial, returned to the question whether the case should have gone to the jury and determined that it should not have.

**6.** The portion of this quotation which we have emphasized answers, in our view, the claim by the Union that the *Glover* futility exception applies only to the exhaustion of intraunion remedies but not to contractual grievance pro-

cedures. *See Battle v. Clark Equip. Co.,* 579 F.2d 1338, 1344–46 (7th Cir.1978). *See generally Chesapeake and O. Ry. v. Ford,* 590 F.2d 557, 558 n. 2 (4th Cir.1979).

**7.** We also believe that Owens and the Union are probably collaterally estopped from raising this argument. In the first appeal of this case, we determined that plaintiffs could state a claim for breach of the duty of fair representation in part because "it would have been futile for the other plaintiffs to file similar grievances." 560 F.2d at 856. Plaintiffs, however, did not make this argument either below or on this appeal and thus, we think it is unnecessary to consider the issue anew on this appeal.

ing Schultz's. Rather, the facts relating to all the employees qualified for the apprenticeship program are the same. The contract claims of each of these employees are also identical: these employees have not been placed in the program because Owens and the Union have erroneously interpreted the contract as not *requiring* maintenance of a one-to-eight ratio. Thus, when the Union assented to Owens' rejection of Schultz's claim, it in effect adopted a position rejecting the claims of the similarly situated plaintiffs. These circumstances provide sufficient evidence to support our belief that it would have been futile for the plaintiffs to pursue their claims before the Union.[8]

On the question of the timeliness of Schultz's grievance, the district court found that Schultz had failed to file his grievance within the three-day period specified by the collective bargaining agreement; the court thus concluded that this suit under section 301(a) was barred as to both defendants. Although the court declined to determine precisely when the claim underlying Schultz's grievance accrued, the district court was sure that, since Schultz had first qualified for placement in the program more than two years before filing this grievance, the grievance must be untimely.

But even if failure to file a timely grievance would be an available defense in this section 301(a) case,[9] we do not believe that under the facts here this defense is available to either Owens or the Union. We think that these defendants, if they have not waived the defense by failing to object to Schultz's grievance as untimely until after the commencement of this litigation, are at least equitably estopped from raising the defense at this time. The doctrine of equitable estoppel may preclude a litigant from asserting a claim or defense when the opposing party would be prejudiced by the litigant's failure to raise the claim in an earlier proceeding. *See Audit Services, Inc. v. Rolfson,* 641 F.2d 757, 761–62 (9th Cir.1981) (applying equitable estoppel in section 301(a) suit). In this case, Owens and the Union misled Schultz and the other plaintiffs about the timeliness of the grievance by considering the merits of Schultz's claim during the three steps of the grievance procedure without objecting to the lack of timeliness. If either the Union or Owens or both had objected to the grievance as untimely when it was filed, it is not inconceivable that the groundwork could have been laid for the filing of a timely grievance, and the claim could thus have

---

**8.** In addition, another exception to the exhaustion requirement of *Republic Steel* is potentially applicable to this case. At least one court (the Ninth Circuit) has determined that if a grievance seeks modification of the collective bargaining agreement, exhaustion principles are not applicable because the relief sought is unattainable through the grievance procedure. *See Williams v. Pacific Maritime Ass'n,* 617 F.2d 1321, 1328 (9th Cir.1980); *Beriault v. Local 40, Super Cargoes and Checkers, ILWU,* 501 F.2d 258, 266 (9th Cir.1974). Here the plaintiffs seek effectively to alter the union-company joint interpretation of the collective bargaining agreement. Although plaintiffs purport to contend that the *written agreement* was improperly construed rather than that they seek a *modification* of that agreement, a modification analysis is not irrational. We think there was sufficient evidence to excuse the plaintiffs other than Schultz under *Williams* and *Beriault* from exhausting their contract remedies.

**9.** We have serious doubts whether such a lack of timeliness defense can ever be asserted in this suit under § 301(a). We have found no case similar to the one at bar where a court dismissed a § 301(a) suit for failure to file a timely grievance when, as here, the grievance was apparently accepted by the union and acted upon by the employer. Typically, the failure to file a timely grievance is an issue when a party attempts to compel arbitration under § 301(a), *see, e.g., Tobacco Workers Union, Local 317 v. Lorillard Corp.,* 448 F.2d 949 (4th Cir.1971); *UMW Dist. 28 v. Flatgap Mining Co.,* 484 F.Supp. 1287 (W.D.Va.1980); or, the timeliness of a grievance may become relevant where the employee attempts to excuse his failure to use the contract grievance procedure by claiming that he could not file a timely grievance. *See, e.g., Cronin v. Bechtel Power Corp.,* 499 F.Supp. 16, 18–20 (M.D.Pa.1979). But neither the district court nor the defendants have pointed to any case holding that, where the plaintiff employee files a grievance which is acted upon by the union and employer, the employee must demonstrate in a subsequent § 301(a) suit that he filed a timely grievance. *See infra,* note 10.

been preserved. To this extent, we are persuaded that Schultz reasonably relied on Owens' and the Union's failure to object and thus, both defendants should be estopped from asserting the timeliness defense on this appeal.[10] *Cf. Southwestern Electric Power Co. v. Local Union No. 738, Electrical Workers,* 293 F.2d 929, 932 (5th Cir.1961) (employer estopped to challenge arbitration for union's failure to follow all contract procedures when employer never asserted this ground as justification for refusal to arbitrate until lawsuit was commenced).

## B. *Failure to Exhaust Intraunion Remedies*

■ The Union also asserts that plaintiffs' action is barred because none of the plaintiffs exhausted their intraunion remedies before filing this lawsuit.[11] This argument, however, is defeated by the Supreme Court's recent opinion in *Clayton v. UAW,* 451 U.S. 679, 101 S.Ct. 2088, 68 L.Ed.2d 538 (1981). In *Clayton,* the Court said that a court could, in the exercise of its discretion, require union members to exhaust intraunion remedies before resorting to lawsuits against both the employer and the union under section 301(a). To guide the exercise of this discretion, the Court noted that to require exhaustion of intraunion remedies in a section 301(a) suit against the union and the employer would be inappropriate when the union remedies could neither reinstate the grievance nor provide directly for the relief requested by the union member. *See* 451 U.S. at 689, 101 S.Ct. at 2095.

In the case before us, we believe we should decline to exercise our discretion to require these plaintiffs to exhaust the remedies outlined in the constitution of the Machinists International Union. Even if plaintiffs exhaust these intraunion remedies, it is extremely doubtful whether the Union could, because of the three-day time limit for filing provided in the contract, reinstate or reactivate the grievances. *Cf. Clayton,* 451 U.S. at 691, 101 S.Ct. at 2096 (exhaustion not required where union could

10. The cases relied upon by the district court on this point are clearly distinguishable. In *Hubicki v. ACF Indus., Inc.,* 484 F.2d 519 (3d Cir.1973), the union refused to process the employee's grievance because the grievance could not be timely filed with the employer as required by the collective bargaining agreement. The *Hubicki* court held that the union had articulated a legitimate, good faith reason for its refusal to act which, because uncontroverted, allowed the entry of summary judgment in favor of the union on the claim of breach of the duty of fair representation. This is not apposite to the claim here that Schultz's suit is barred under § 301(a).

The district court also cited *Chambers v. Beaunit Corp.,* 404 F.2d 128 (6th Cir.1968). There the employee filed a grievance which the union took to arbitration. The arbitrator dismissed the grievance, however, because it was not timely filed under the contract. The employee then filed a breach of contract suit against the employer under § 301(a). The court held that the arbitrator's decision was final and binding, even if it was premised upon the failure to file a timely grievance, and that the employee could not avoid the arbitrator's ruling by filing a § 301(a) action. The *Chambers* court did not hold that a timely grievance was a prerequisite to a suit under § 301(a) but merely reaffirmed the basic principle that an arbitrator's decision properly grounded in the collective bargaining agreement is ordinarily binding under a contract requiring arbitration. *See United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

11. It is unclear from the record whether the Union raised this argument in the district court. Although employers may also raise this defense where the exhaustion of intraunion remedies might reactivate the grievance or provide the relief sought in the grievance, *see Clayton v. UAW,* 451 U.S. 679, 695, 101 S.Ct. 2088, 2098–2099, 68 L.Ed.2d 538 (1981), Owens, in contrast to the Union, has not raised this argument on appeal and apparently did not raise it in the district court. If the argument was not presented below, we ordinarily would not, absent special circumstances, consider it on appeal. *See Harl v. City of LaSalle,* 679 F.2d 123 (7th Cir.1982). The Union, apparently in support of its assertion that the argument was presented below, quotes a phrase from the district court's order which states that "plaintiff[ ] fail[ed] to initiate his union remedies." Read in context, we are not persuaded that the district court intended this phrase to refer to *intraunion* remedies, in contrast to *contract* remedies. Nevertheless, we will consider the argument here because of both the ambiguity of the district court's order and the somewhat unsettled legal status of this issue prior to the *Clayton* decision.

not reactivate grievance, due to fifteen-day time limit). Neither the Union nor Owens has represented that they would not raise the timeliness issue before an arbitrator, and we are uncertain if an arbitrator would be bound by the principles of estoppel to consider the three-day limit waived. *Cf. Tobacco Workers Union, Local 317 v. Lorillard Corp.*, 448 F.2d 949 (4th Cir.1971) (question whether grievance was timely filed may be considered anew by arbitrator). Similarly, we do not believe that the Union could directly provide the relief sought by these plaintiffs, *i.e.*, placement in the apprenticeship program. Under these circumstances, we think it would be unjust to require plaintiffs to exhaust the uncertain and inadequate intraunion remedies as a prerequisite to this suit against Owens and the Union.[12]

## III. BREACH OF THE DUTY OF FAIR REPRESENTATION

■ As another of the grounds for granting directed verdicts in favor of both defendants, the district court concluded that there was "no evidence to support Plaintiffs' claim that the [Union] engaged in conduct towards its members which was in breach of the duty of fair representation." Order of Sept. 16, 1980, at 2. The breach of the duty of fair representation is, of course, the heart of plaintiffs' claim against the Union. Moreover, plaintiffs' claim against Owens fails unless the fair representation claim against the Union succeeds. A breach of the Union's duty of fair representation is a prerequisite to employee suit under section 301(a) when, as here, the collective bargaining agreement vests exclusive authority to process grievances in the Union. *See Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).

Duty of fair representation cases may take two forms. First, there are those cases predicated upon claims that the union breached its duty in *negotiating* a collective bargaining agreement. Second, there are cases alleging that the union breached its duty in *administering* the collective bargaining agreement (*e.g.*, in processing a grievance). *See* Leffler, *Piercing the Duty of Fair Representation: The Dichotomy Between Negotiations and Grievance Handling,* 1979 U.Ill.L.F. 35. The Supreme Court has implicitly recognized this dichotomy by defining a different standard in each of these two different situations. There is one standard for appraising a union's conduct when a claim arises out of union actions in negotiating agreements with an employer and a different standard when the claim arises from a union's administration of the collective bargaining agreement, especially in the context of processing grievances.

■ Thus, in *Ford Motor Co. v. Huffman,* 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953), plaintiffs claimed that their union breached its duty of fair representation by agreeing to a contract clause granting seniority credit to employees for time spent in prior military service. In the course of rejecting this claim, the Court recognized that the union is obligated "to represent all members of an appropriate unit [and] to make an honest effort to serve the interests of all those members, without hostility to any." 345 U.S. at 337, 73 S.Ct. at 686. The Court also recognized that in contract negotiations "[t]he complete satisfaction of all who are represented is hardly to be expected." 345 U.S. at 338, 73 S.Ct. at 686. And, the Supreme Court warned that, when assessing the conduct of the union in the

12. The tack taken by the concurring opinion with respect to the exhaustion of intraunion remedies and the timeliness of complaint would perhaps be apt if the injury alleged arose out of the administration of the contract. However, where, as here, the alleged injury arises instead out of an agreement struck during collective bargaining, the disposition of Schultz's grievance was a foregone conclusion. It could therefore be seen as futile for Schultz to have attempted to exhaust intraunion remedies or for the other plaintiffs to have filed complaints. Further, since the subject matter before us is not an injury arising out of the administration of the contract, it is much more difficult to determine when Schultz's grievance arose (for purposes of the three-day limit) in the context of a continuing agreement between Owens and the Union.

course of negotiating with the employer, "[a] wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion." 345 U.S. at 338, 73 S.Ct. at 686. This court recently applied the *Huffman* principles to a similar case arising from a union's negotiation of modified seniority rights, stating that the union "lawfully could follow the dictates of the majority if they determined in good faith that the decision reflected a proper resolution of conflicting but legitimate interests." *Alvey v. General Electric Co.*, 622 F.2d 1279, 1289 (7th Cir.1980); *accord Rupe v. Spector Freight Systems, Inc.*, 679 F.2d 685 (7th Cir.1982).

On the other hand, when assessing a union's conduct in processing a grievance, the Supreme Court, while also using a "good faith" standard, has not purported to grant the union "a wide range of reasonableness." Thus, in *Vaca v. Sipes*, 386 U.S. 171, 190, 87 S.Ct. 903, 916–917, 17 L.Ed.2d 842 (1967), the Court stated that a union's processing of a grievance (more precisely, the refusal to take a grievance to arbitration) would violate the duty of fair representation if the union's conduct towards the employee "is arbitrary, discriminatory, or in bad faith." *Accord Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 566–69, 96 S.Ct. 1048, 1057–1058, 47 L.Ed.2d 231 (1976); *Humphrey v. Moore*, 375 U.S. 335, 350, 84 S.Ct. 363, 372, 11 L.Ed.2d 370 (1964); *Rupe v. Spector Freight Systems, Inc.*, 679 F.2d 685, 691–92 (7th Cir.1982); *Hoffman v. Lonza, Inc.*, 658 F.2d 519, 521–22 (7th Cir.1981) (Cudahy, J., concurring). But the Court did not, in articulating this standard in this context, focus on the inherent difficulties of satisfying the demands of diverse employees as it had in *Huffman*. Instead, the Court emphasized the union's statutory obligation to represent each individual employee fairly, with a nonperfunctory concern for his complaints and with a nonarbitrary exercise of judgment in evaluating grievances. The application of the *Vaca* standard in the context of grievance procedures does not provide for union discretion within "a wide range of reasonableness"—in contrast to the collective bargaining standard of *Huffman*.

■ We emphasize these differences between union conduct in representing diverse employees in collective bargaining and union conduct in representing employees having individual grievances, because plaintiffs' claims here appear to involve activities of the Union both in ostensibly negotiating the non-mandatory interpretation of the apprentice ratio and in processing the grievance filed by Schultz. Thus, plaintiffs assert, *inter alia*, that the Union, by agreeing with Owens that the one-to-eight ratio need not be strictly adhered to, breached its duty of fair representation. But we do not believe that a jury could find that the Union here lacked "complete good faith and honesty of purpose in the exercise of its discretion," *Huffman*, 345 U.S. at 338, 73 S.Ct. at 686, by arriving at this interpretation with Owens, even though the written contract language was not changed. Both Owens and the Union were aware of the compelling economic arguments for interpreting the apprentice ratio as non-mandatory. The Union was also aware that the same or similar language had, in more than 750 other contracts, been interpreted to be non-mandatory; and this interpretation of the contract language is not patently unreasonable.[13] Even though the plaintiffs were

---

**13.** Plaintiffs argue that the unreasonableness of the Union's interpretation of the contract language is evinced by our decision in *Schultz I* where, according to plaintiffs, the court interpreted this ratio language to be "mandatory." But plaintiffs misstate our holding in *Schultz I*. The limited holding of that opinion was that the 1974 "collective bargaining agreement establishes a *mandatory apprenticeship program* that was not made voluntary by the Standards of Apprenticeship or by [certain changes agreed to during contract negotiations (which are not discussed here)]." 560 F.2d at 856 (emphasis supplied); *see id.* at 854 ("[W]e have demonstrated that the apprenticeship program was mandatory under the [contract].") The issue in *Schultz I* was whether plaintiffs could assert any rights in the apprenticeship program for which they could state a claim for breach of contract and breach of the duty of fair repre-

disadvantaged by the interpretation agreed to by the Union, the Union was entitled to balance plaintiffs' interests against the putative interest of its members in preserving their employer as a viable economic entity.[14]

Plaintiffs here presented no evidence to show that the Union's decision to allow Owens flexibility in appointing employees to the apprenticeship program was motivated by anything even remotely akin to hostility, bad faith or arbitrariness. *Cf. Baker v. Newspaper and Graphic Communications Union, Local 6,* 628 F.2d 156 (D.C.Cir.1980) (union did not breach duty of fair representation by agreeing to dovetail seniority lists, even though dovetailing disadvantaged some employees, when union was concerned with preserving jobs). The Union tried in 1974, without success, to bargain an interpretation with Owens which would have been favorable to plaintiffs; but in the absence of any evidence to indicate bad faith or arbitrariness on the Union's part, we cannot fault the Union's negotiating decisions. If the Court's admonition to accord a "wide range of reasonableness" to the union in carrying out its statutory obligation as exclusive bargaining agent is to mean anything, we believe that the Union here cannot be found to have breached its duty of fair representation in negotiating this agreement with Owens. *See Rupe v. Spector Freight Systems, Inc.,* 679 F.2d 685 (7th Cir.1982). Nor is there anything inherently unacceptable about the Union's reaching an understanding with Owens about the interpretation of the apprenticeship provision, which was not reflected by a formal change in the written agreement. Under some circumstances such extrinsic unwritten understanding might raise serious issues, but we do not perceive such circumstances here. *Cf. Anderson v. United Paperworkers International Union,* 641 F.2d 574 (8th Cir.1981) (union breached duty of fair representation when it made knowing misrepresentation to induce ratification of collective bargaining agreement).[15]

Further, with respect to the second aspect of the fair representation claim, we

sentation. We answered that question affirmatively because we found that Owens was required by the collective bargaining agreement to establish such a program thus providing plaintiffs with a basis in the contract for their claim that Owens breached the contract. And, because of the mandatory nature of the *program,* plaintiffs could also state a claim that the Union breached its duty of fair representation in not protecting their contract rights in this program. We are now faced with a different question: determining on the *merits* whether the interpretation by the Union of the contract language creating that program actually breached the Union's duty of fair representation.

14. The major goal of the duty of fair representation is to identify and protect individual expectations as far as possible without undermining collective interests. Where the individual and collective group interests clash, the former must yield to the latter. When collective bargaining agreements are executed, there may be many provisions which lead individual employees to believe they are entitled to specified benefits but, in the final analysis, the collective group interests must remain paramount. The nature of any labor policy requires an election between preserving group interests through democratic processes and adopting external restraints to protect the minority.

*Alvey v. General Elec. Co.,* 622 F.2d 1279, 1289 (7th Cir.1980) (quoting *Tedford v. Peabody Coal Co.,* 533 F.2d 952, 956–57 (5th Cir.1976); *accord Williams v. Western Elec. Co.,* 530 F.Supp. 481, 486 (N.D.Ill.1981).

15. Plaintiffs argue that the secret nature of the agreement between Owens and the Union is evidence of the Union's bad faith conduct. But the plaintiffs' only evidence of alleged failure to disclose are the assertions by several plaintiffs that Hemken never mentioned the oral agreement regarding the apprenticeship clause at the contract ratification meeting held in December 1971. Although Hemken testified that he disclosed the oral interpretation to the membership, for purposes of affirming a directed verdict we must accept the assertions of certain plaintiffs to the contrary. In any event, these assertions do not in our view demonstrate bad faith by the Union since the Union's agreement regarding the interpretation of the apprenticeship clause was made crystal clear to all employees, including the plaintiffs, during 1972 and 1973 at the monthly grievance meetings. Moreover, the Union pressed the plaintiffs' claims for more apprentices during the 1974 contract negotiations, again evincing a good faith effort to achieve the plaintiffs' demands through the collective bargaining process. The case before us is thus distinguishable from the affirmative misrepresentation present in *Anderson,* 641 F.2d 574.

do not believe that there is sufficient evidence in this case upon which a jury could determine that the Union breached its duty of fair representation in processing Schultz's grievance. The Union was fully aware of the basis for Schultz's grievance since this issue had arisen during negotiating sessions and monthly grievance meetings. Although the Union, given its 1971 understanding with Owens, could probably have, without breach of its duty, rejected the grievance outright, the Union pressed ahead with Schultz's claim, taking it through all stages of the grievance procedure preceding arbitration. Neither Schultz nor any other plaintiffs have asserted that Hemken, who handled the grievance for the Union, was personally hostile to them or that he failed to act as a diligent advocate for their cause when dealing with Owens on the merits of Schultz's claim. When Hemken determined not to request arbitration, he wrote a letter to Schultz explaining why he thought the grievance was without merit.[16]

These actions with respect to the grievance do not constitute a breach of the duty of fair representation. There is nothing in the evidence to indicate bad faith, arbitrariness or discrimination on the part of the Union. To the contrary, the evidence unambiguously suggests that Schultz's claim was considered by the Union, pressed before Owens and ultimately dropped after a careful assessment of its merits. A jury, in our view, is left with no other conclusion than that the Union did not breach its duty of fair representation in processing Schultz's grievance. *See Rupe v. Spector Freight Systems, Inc.,* 679 F.2d 685, 693–94 (7th Cir.1982); *cf. Cote v. Eagle Stores, Inc.,* 688 F.2d 32 (7th Cir.1982) (per curiam) (granting summary judgment to union and employer on duty of fair representation question).

## IV. CONCLUSION

The district court also found that directed verdicts for the defendants were proper be-

cause there was no evidence from which a jury could find either that Owens breached the collective bargaining agreement by not maintaining the one-to-eight ratio or that plaintiffs suffered damage due to the alleged breach of contract. Although defendants have argued in support of the district court's decision on these grounds, we need not consider those arguments here in the absence of substantial evidence of a breach of the duty of fair representation. The finding of such a breach is an essential element of plaintiffs' section 301(a) suit against both the Union and Owens. *Rupe v. Spector Freight Systems, Inc.,* 679 F.2d 685, 691 (7th Cir.1982); *see Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).

The order of the district court directing verdicts in favor of the Union and Owens is affirmed.

AFFIRMED.

COFFEY, Circuit Judge, concurring.

I concur in the result reached by the majority in Part III, *infra,* that there has been no breach of the duty of fair representation, but I am compelled to write separately because I feel the majority has misinterpreted the basic federal labor policy mandating that the manner in which disgruntled or aggrieved employees file grievances and indeed their right to file a grievance must initially be determined by resort to their labor contract. As noted by the district court, every plaintiff herein, except Schultz, "failed to file grievances or formal claims against Owens-Illinois pursuant to the grievance and arbitration machinery of the labor contract." It is a basic tenet in almost all labor contracts that individual employees wishing to assert a contract grievance must initially make use of those procedures (arbitration, etc.) provided for in the labor contract between the parties. *Re-*

16. We have indicated previously that the apparent economic ramifications of accepting a mandatory interpretation of the apprenticeship provisions of the contract—the same reasons given by Hemken in his letter to Schultz—were proper considerations for the Union and their consideration was consistent in this case with its duty of fair representation.

*public Steel v. Maddox,* 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1969). While the majority opinion agrees with this basic concept and indeed cites *Republic Steel,* I feel a more extensive quotation of the language in *Republic Steel* will more clearly and emphatically demonstrate how strong and firmly entrenched the policy is to promote initial redress to contractual grievance procedures before allowing parties to proceed in the federal courts.

"As a general rule in cases to which federal law applies, federal labor policy requires that individual employees wishing to assert contract grievances must *attempt* use of the contract grievance procedure agreed upon by employer and union as the mode of redress. If the union refuses to press or only perfunctorily presses the individual's claim, differences may arise as to the forms of redress then available. *But unless the contract provides otherwise, there can be no doubt that the employee must afford the union the opportunity to act on his behalf.* Congress has expressly approved contract grievance procedures as a preferred method for settling disputes and stabilizing the 'common law' of the plant. Union interest in prosecuting employee grievances is clear. Such activity complements the union's status as exclusive bargaining representative by permitting it to participate actively in the continuing administration of the contract. In addition, conscientious handling of grievance claims will enhance the union's prestige with employees. Employer interests, for their part, are served by limiting the choice of remedies available to aggrieved employees. *And it cannot be said, in the normal situation, that contract grievance procedures are inadequate to protect the interests of an aggrieved employee until the employee has attempted to implement the procedures and found them so.*

A contrary rule which would permit an individual employee to completely sidestep available grievance procedures in favor of a lawsuit has little to commend it. In addition to cutting across the interests already mentioned, it would deprive employer and union of the ability to establish an uniform and exclusive method for orderly settlement of employee grievances. If a grievance procedure cannot be made exclusive, it loses much of its desirability as a method of settlement. A rule creating such a situation 'would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements.' "

*Republic Steel,* 379 U.S. at 652–53, 85 S.Ct. at 616–617 (citations and footnotes omitted, some emphasis supplied).

This strong statement of federal labor policy mandates that employees who are aggrieved by the actions of their employer must first look to and follow the language contained in their labor contract, the "exclusive method for orderly settlement of employee grievances." It is only after this "exclusive method" fails that the federal courts are available to the grievant. Courts must not permit employees to ignore the procedures mutually agreed upon for handling grievances by filing suit in the federal courts, thus increasing the burden on our already overcrowded court system. Grievance procedures, including arbitration, were agreed upon by labor and management to avoid the time and expense of litigation and further to avoid industrial strife. *United States Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). Once we allow workers, as the majority suggests, to circumvent these contractually agreed upon procedures, we invite industrial strife and undermine the validity of the collective bargaining process.

The contract in the instant dispute requires that any grievance be filed within three working days of the event giving rise to the claim. The plaintiffs herein (with the exception of Schultz) did not even attempt to file a grievance, completely disregarding the three-day time limit set forth in the labor contract. The majority ignores the fact that "[w]e must construe the contract as written, rather than make a new contract for the parties," *Oddie v. Ross Gear and Tool Co.,* 305 F.2d 143, 148 (6th

Cir.1962), and expands upon existing case law, citing *Glover v. St. Louis-San Francisco R.R.,* 393 U.S. 324, 89 S.Ct. 548, 21 L.Ed.2d 519 (1969), in an effort to avoid the plaintiffs' failure to follow the steps set forth in the contract. In *Glover* Justice Black noted that certain exceptions exist to the requirement of exhaustion of intraunion remedies. The majority notes that one exception is where "a formal effort to pursue contract or administrative remedies would be absolutely futile." *Id.* at 331, 89 S.Ct. at 552. However, the majority's analysis of *Glover* stops too short. The quotation relied upon by the majority is followed by the statement that "[u]nder these circumstances, the attempt to exhaust contractual remedies, required under [*Republic Steel Corp. v. Maddox*], is easily satisfied by petitioners' repeated complaints to company and union officials, and no time consuming formalities should be demanded of them." *Id.* (Some emphasis supplied). *Glover* involved the petition by eight black and five white men, all employees of the St. Louis-San Francisco R.R. Co. employed to repair and maintain passenger and freight cars. The plaintiffs alleged that the railroad/employer refused to promote its black workers in accordance with a tacit understanding between the employer and the Union. In an amended complaint, the plaintiffs alleged that they had repeatedly complained both to representatives of the Union and to representatives of the company concerning the violation of the collective bargaining agreement. The *Glover* Court responded:

> "[t]he allegations are that the bargaining representatives of the car employees have been *acting in concert with the railroad employer to set up schemes and contrivances* to bar Negroes from promotion wholly because of race. If that is true, insistence that petitioners exhaust the remedies administered by the union and the railroad would only serve to prolong the deprivation of rights to which these petitioners according to their allegations are justly and legally entitled."

*Glover,* 393 U.S. at 331, 89 S.Ct. at 552 (emphasis supplied).

In contrast to the egregious conduct of the Union and the employer in *Glover,* there is nothing in the record in the instant case which demonstrates that the bargaining representatives and Owens-Illinois were "acting in concert" or "set up schemes and contrivances" to deprive the plaintiffs herein of rights to which they are legally entitled. While it is true that the Union and the employer mutually agreed upon an interpretation of the contract which is adverse to the plaintiffs' position, this alone does not justify the majority's conclusion that "once Schultz's grievance was rejected, it would be futile for the plaintiffs other than Schultz to have filed grievances." The conduct of the employer and the Union herein does not rise to the level of the parties in *Glover,* and therefore the mere assumption on the part of the plaintiffs that the Union would not effectively act upon their grievances is insufficient to disregard the filing requirements of the contract and *Republic Steel.*

Finally, I take issue with the majority's position that the defendants should be equitably estopped from raising the defenses of the plaintiffs' failure to timely file a grievance and/or exhaust intraunion remedies. Initially, it must be noted that even if the doctrine of equitable estoppel were to be available to any of the plaintiffs, which I do not concede that it is, that doctrine would only be available to Schultz. This is so because the Union's action or inaction with respect to objecting to the timeliness of Schultz's filing could only reasonably induce action or inaction on the part of Schultz. Schultz's grievance was an individual one, and as such, any action on the part of the defendants with regard to this grievance affects Schultz only. Thus, I cannot understand the majority's position that "the groundwork could have been laid for the filing of a timely grievance, and the claim could thus have been preserved." The district court noted that Schultz's grievance was filed in 1976, while the events which gave rise to the grievance occurred during the period of 1971 through 1974. I am unable to understand what "groundwork could have been laid for the filing of a

timely grievance" which the majority asserts would have allowed Schultz (or any of the plaintiffs) to file grievances within the three-day time limit even if the Union had initially contested the timeliness of Schultz's grievance. The filing deadline had passed some two to five years before there was any action or inaction on the part of the Union with respect to the timeliness of Schultz's grievance. Therefore, since our review is limited to a reading of the four-corners of the labor contract and we "must construe the contract as written rather than make a new contract for the parties," and since there could be no reliance or change of position by any of the plaintiffs with respect to the Union's failure to object to the timeliness of Schultz's grievance, I would affirm the district court on the issues discussed herein.