Jay BURMAN, et al., Plaintiffs,

v.

TRANS WORLD AIRLINES, INC., et al., Defendants.

No. 82 C 1960.

United States District Court, N.D. Illinois, E.D.

Sept. 13, 1983.

Mark L. Schwartzman, Jerome Rotenberg, Chicago, Ill., for plaintiffs.

James W. Johnson, Legal Dept., ALPA, Washington, D.C., Richard Watt, Cotton, Watt, Jones, King & Bowlus, Chicago, Ill., for ALPA.

Gordon B. Nash, Jr., Gardner, Carton & Douglas, Chicago, Ill., for TWA; Michael A. Katz, New York City, of counsel.

## MEMORANDUM OPINION

WILL, District Judge.

This is an action brought by thirteen flight officers employed by Trans World Airlines ("TWA") seeking injunctive relief against TWA and against the Air Line Pilots Association International ("ALPA"), the labor organization representing the pilot-employees, pursuant to the Railway Labor Act, 45 U.S.C. §§ 151, *et seq.* and 28 U.S.C. § 1337. Plaintiffs seek to enjoin the enforcement by TWA and ALPA of a provision contained in a collective bargaining agreement of April 7, 1982, that prohibits pilots from wearing beards.[1] Plaintiffs contend that ALPA violated its duty of fair representation. TWA and ALPA have

---

1. The provision applies to all TWA flight officers (pilots, co-pilots, and flight engineers) and states: "The wearing of beards or other facial hair, with the exception of neatly trimmed and maintained sideburns or mustaches, is prohibited." (Agreement, § 2(*o*).)

moved for summary judgment. For the reasons hereinafter stated and after a careful consideration of the extensive record, including all pleadings, affidavits, exhibits, depositions, and answers to interrogatories, we find that there are no genuine issues of material fact in dispute and that both defendants are entitled to summary judgment as a matter of law.

### I.

On March 31, 1982, eight TWA pilots sought a temporary and permanent injunction and/or temporary restraining order to enjoin TWA and ALPA from carrying out any enforcement of the collective bargaining agreement's provision for the removal of facial hair other than well-trimmed mustaches. (R. 1) On March 31, 1982, we granted a temporary restraining order which was once extended with the defendants' consent and which was dissolved on June 26, 1982. (R. 26) On April 26, 1982, TWA filed a motion to dismiss the action pursuant to Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. (R. 8) On June 10, 1982, we denied the defendants' motions to dismiss the complaint and we denied plaintiffs' motion for a preliminary injunction (R. 26) so that the parties could proceed with discovery, find out what happened during the negotiations, and determine whether there was adequate represen-

tation of the TWA pilots in the negotiations.

Subsequently, on December 6, 1982, TWA and ALPA moved for summary judgment on the grounds that there is no evidence on which plaintiffs can establish a breach of the duty of fair representation by ALPA regarding its conduct during the negotiation of the no-beard clause.

### II.

The following facts are not in dispute. Prior to March 1978, TWA had in effect regulations governing the appearance of flight officers which, among other things, prohibited them from wearing beards of any description. In March 1978, in a grievance proceeding instituted by ALPA on behalf of a Captain H.E. Richards, the TWA–ALPA Pilots System Board of Adjustment issued an award in which it was determined by a 3–2 vote that TWA's rule prohibiting beards was unreasonable. ("Richards Decision") The Richards Decision stated that TWA had introduced insufficient evidence to show that the rule was necessitated by factors of either safety or customer acceptance. Thus, TWA was barred from enforcing any rule absolutely prohibiting facial hair from being worn by flight officers, but could only require that it be "neatly trimmed and maintained." On April 21, 1978, TWA issued a Policy Bulletin regarding Grooming Policy—Beards.[2]

**2. GROOMING POLICY—BEARDS**

A recent arbitration award requires TWA Flight Operations to permit the wearing of beards. This is contrary to corporate policy for front line employees and while we do not endorse this required policy change and further strongly recommend against the growing of facial hair, effective immediately beards are no longer prohibited.

If you elect to grow a beard, the following guidelines must be strictly adhered to:

1. The beard must be neatly trimmed and maintained as such. No unusual or extraordinary shapes or sizes will be permitted.
2. No intermediate growth or growing of beards will be permitted while on duty. Beards must be grown to an acceptable appearance while on vacation or otherwise off duty.

NOTE: To avoid misunderstanding or potential conflict, all crew members wearing a beard must present themselves to their GMF or

his representative in a timely manner for inspection prior to flight assignment. This will alleviate the possibility of a flight delay if a beard is determined to be unacceptable.

Recent information has been provided by our oxygen mask manufacturer regarding the safety aspect of a tightly fitting mask. Unlike certain military type oxygen masks which are dependent upon a harness or helmet connection to aid in providing a tight fit, the sweep-on mask aboard TWA aircraft relies heavily on a facial seal to prevent oxygen leakage. Since the wearing of a beard will obviously effect [sic] this seal, it can therefore be anticipated that the effectiveness of supplemental oxygen will be somewhat reduced. Those intending to grow a beard should consider all facets related to this new policy and it is recommended that all crew members desiring to exercise this privilege consult with the General Manager—Flying for additional information.

Negotiations between ALPA and TWA began on July 1, 1981 for the purpose of negotiating an extension of the Collective Bargaining Agreement due to expire on September 30, 1981. The parties exchanged opening proposals. At the initial session, TWA proposed a "no beard clause":

The wearing of beards or other facial hair, with the exception of neatly trimmed and maintained sideburns or mustaches as described in FOP is prohibited.

The no beard clause was discussed at the bargaining sessions on July 28, October 5, October 15, and October 21. The clause was agreed to by ALPA and TWA on October 21, 1981, and signed off on October 22, 1981. Agreement on this no beard clause nullified the Richards Decision of March 1, 1978.

The parties continued negotiations on other matters in at least fifteen additional bargaining sessions, culminating in full agreement on all issues on February 4, 1982. Following "road show" meetings of the ALPA membership of TWA pilots held by ALPA at the various pilot bases to explain the provisions of the new agreement, ALPA's TWA Master Executive Council ratified it.[3] It was then executed by both parties.

### III.

The following "facts" appear to be disputed. Whether they relate to genuine and material legal issues, *Hall v. Printing and Graphic Arts Union, Local # 3*, 696 F.2d 494 (7th Cir.1982), we will consider later in this opinion.

Plaintiffs contend that on either October 15 or October 21, 1981, the Chairman of the Union Negotiating Committee, Wayne Haggard, went with Bill Hoar of the Company's Negotiating Committee outside of the bargaining room and when they returned to the room they announced "we just finalized the beard issue." Plaintiffs' Memorandum in Answer to Defendants' Motion for Summary Judgment at 2, # 5. ("Plaintiffs' Memo") TWA notes that this allegation appears only in ALPA negotiator Marchione's deposition at 27–28 and, even if true, creates no genuine issue since there is no legal requirement that all discussions must take place across a table with all the negotiating members present. Reply Memorandum of Points and Authorities in Support of Motion of Defendant Trans World Airlines, Inc. for Summary Judgment at 5, ¶ 5 ("TWA Reply Memo"). Further, TWA states that Marchione testified that the full committee agreed to accept the no beard clause (Dep. at 71) and that this was confirmed by ALPA chief negotiator Haggard (Dep. at 38).

Plaintiffs claim that the discussions regarding the no beard clause were no longer than 3–5 minutes in length in any one day. Plaintiffs' Memo at 4, ¶ 6. TWA states that this is not confirmed in any of the depositions and, even if true, it is not probative of misconduct, considering the relative simplicity of the no beards proposal and the length and complexity of the overall negotiating agenda. TWA Reply Memo at 5, ¶ 6.

The parties differ also as to the safety aspect of the no beard clause. Plaintiffs allege that at no time did the discussions regarding the clause concern the subject of

There has been a concerted effort over the years by all departments in TWA to create appearance consciousness among all employees, especially individuals who work in a customer contact environment. It has been proven that personal appearance does influence the public in choosing an airline. Let's work together to maintain good grooming standards—shoes shined, hair neatly trimmed and combed, clothing clean and pressed and uniform and hats worn properly.

A crew member well groomed and uniformed presents a picture of "professionalism". Pride in one's work and company will be noted by passengers time and again. This difference may cause potential passengers to choose TWA over our competitors.

Your cooperation and pride in maintaining a high standard of appearance will be valued and respected by our traveling public as well as your fellow crew members. Thanks for your help.

3. Under ALPA's Constitution and By-Laws, this constituted final ratification. There is no provision for ratification votes by the membership at large. ALPA Const. art. xviii, § 2.

safety, nor was safety advanced by the Company as a rationale for the no beards clause. Plaintiffs Memo at 4, ¶ 7. TWA replies that TWA Chief Negotiator Kamm stated that, from TWA's standpoint, safety was the rationale, and that although she may not have used that very word during negotiations, she believed everyone who was a party to the negotiations understood safety to be TWA's reason for seeking the clause. TWA Reply Memo at 5, ¶ 7 (Kamm Dep. at 26, 37, 76, 81–83). Further, ALPA Negotiator Marchione understood that the Company's objective was one of safety. *Id.* (Marchione Dep. at 15) TWA claims, however, that even if ALPA believed that TWA's desire to prohibit beards was based on grooming or image considerations, its agreement to the clause would not amount to intentional misconduct. *Id.* at 5–6.

Plaintiffs say that no TWA bearded cockpit personnel was disciplined for a violation of the personnel regulations which were in existence after the Richards Decision, nor were there any reported flight safety incidents due to facial hair from March 1978 to April 1, 1982. Plaintiffs' Memo at 4, ¶ 8. In reply, TWA states that the allegations are not material, that the safety implications of beards upon the effective functioning of flight crew masks is established by Kenneth C. Ensslin's affidavit and attached

exhibits[4] and that air carriers are not required to defer action regarding potential safety threats until after occurrence of an incident. TWA Reply Memo at 6, ¶ 8.

Plaintiffs contend that members of ALPA's negotiating committee opined that the Company wanted the no beard proposal accepted because the Vice President of Flight Operations and other senior management personnel wanted TWA pilots to be clean shaven for image purposes. Plaintiffs' Memo at 4, ¶ 9. But TWA notes that neither of the two ALPA negotiators who offered this opinion did so on the basis of first-hand knowledge. TWA Reply Memo at 6, ¶ 9 (Murphey Dep. at 80–81; Haggard Dep. at 11, 68–71).

Plaintiffs' allegation that there was no specific *quid pro quo* or trade-off on the no beard clause, Plaintiffs' Memo at 4, ¶ 11, is not considered a material fact by TWA since TWA contends that there is no such requirement. TWA Reply Memo at 6, ¶ 11. Similarly, since there is no such requirement for particular trade-offs, TWA considers it a nonmaterial fact that no member of the union negotiating committee solicited any active flight status TWA bargaining unit bearded cockpit personnel as to advice or suggestions regarding the clause after the company proposed it in July 1981.

---

4. *See* Exhibit T to Aff. of Ensslin in Opposition to Plaintiffs' Motion for Preliminary Injunction. A number of United States air carriers have issued regulations governing the appearance of flight crews which prohibit beards. *See, e.g.:*

1) American Airlines Flight Manual, Part I, §§ 3, 17–18 (November 16, 1981) ("The face will be clean shaven except mustaches are permitted.")

2) Pan Am 2/10 Flight Operations Administration: Flight Crew Personal Appearance (Jan. 27, 1981) (A beard is not permitted.")

3) Eastern Flight Operations Manual, Administration 2.1 General K. Personal Appearance 2–1–3 (Sept. 25, 1979) ("Beards or goatees of any type are not permitted.")

4) United Airlines Flight Operations Manual, Industrial Relations (Feb. 20, 1981) ("Beards or goatees are not permitted.")

5) Flying Tiger Line, letter to Puritan-Bennett Air Systems Co. (Dec. 12, 1980) from H.W. Brunetti, Director-Safety (referring to Operations Manual) ("Goatees and beards will not be worn.")

6) US Air, letter to Puritan-Bennett Aero Systems Co. (Dec. 18, 1980) from R.M. Sessa, Vice-Pres.—Flying ("USAir's policy does not permit operating Flight Crew members to have beards and imposes limits upon mustache size.")

7) U.S. Air Force, letter to Labor Relations, Trans World Airlines, Inc. (between Nov. 13 and Dec. 1, 1980 but undated) R.M. DeHart, Col. U.S.A.F. ("The only facial hair permitted by USAF regulations is a well-trimmed mustache.")

8) U.S. Navy/Marine Corps Directive, Survival 722–723n. Beards ("For those who use oxygen masks routinely, beards are prohibited.")

Plaintiffs have not controverted these documents and therefore the fact that a number of air carriers have a prohibitory provision re: beards is not in dispute. *See also* NEWSWEEK, April 19, 1982, at 42 (British forces enroute to the Faulkland Islands for possible combat on orders shaved off their beards so their gas masks would fit more snugly).

TWA Reply Memo at 6, ¶ 13; Plaintiffs' Memo at 4, ¶ 13. TWA also points out that plaintiffs Dolge and Liston were aware as early as July 1981 that the no beard clause had been proposed by TWA. (Answers to TWA Interrogatory No. 3)

The parties further differ as to whether some members of the Union Negotiating Committee had serious reservations concerning the validity or legality of the clause; plaintiffs asserting that some members had serious reservations, Plaintiffs' Memo at 5, ¶ 14, and TWA asserting that no members had serious reservations and that while each ALPA negotiator anticipated that lawsuits might be brought by dissatisfied ALPA members, he believed that such suits would be regarded as meritless. TWA Reply Memo at 6, ¶ 14, citing Haggard Dep. at 34–35, 52–53; Marchione Dep. at 43–45; Murphey Dep. at 57–58.

There is additional disagreement as to whether the Chairman of the Negotiating Committee informed members at various LEC and MEC meetings that there was a mediator present on the date the clause was agreed to and he had stated, "The meter is running, agree to the clause or you will be under a strike situation." TWA notes that in both Marchione's and Haggard's depositions, they denied making any such statements, TWA Reply Memo at 6, ¶ 15, citing Marchione Deposition at 38–40; Haggard Deposition at 47–49, and that, in the event the statements were made it is not a material fact since not related to the substance of the agreement or ALPA's reasons therefor. *Id.*

The parties also differ regarding Chairman of the Negotiating Committee Haggard's statements to plaintiff Burman at a meeting held to explain the provisions of the new contract. Plaintiffs allege that Haggard informed the members of MEC # 2 that he was not going to give any reason why the clause was agreed to as he was not going to try Burman's lawsuit at the meeting. Plaintiffs' Memo at 5, ¶ 16. However, TWA explains that, faced with the threat of a lawsuit, Haggard cannot be faulted for refusing to engage in a public

dialogue with Burman in which his statements might be taken out of context. TWA Reply Memo at 7, ¶ 16, citing Haggard Dep. at 53–54.

Paragraph 17 of Plaintiffs' Memo quotes MEC member Tom Liston, a plaintiff in this suit, at the February 18, 1982 ratification meeting in San Francisco:

> As unenthusiastic as I am with many of its provisions, I am prepared to accept this contract as possibly the best that could be had under the circumstances. It has many flaws, but, with one ludicrous exception, it confines itself to essential collective bargaining matters.
>
> It is that one exception that I feel compelled to comment on. I'm referring, of course, to the senseless prohibition against the wearing of beards, which the negotiating parties have seen fit to include in this working agreement. It emanates from a prejudiced state of mind and has nothing whatever to do with any legitimate consideration of productivity, efficiency or compensation. It is an insult to my sense of personal freedom and dignity, and I cannot over-emphasize the degree of resentment I feel at having to give it credence by supporting this contract package. I can assure you that, were we to ratify on an item by item basis, I would, without hesitation, reject this provision as an affront to my intelligence and as an assault on the freedom of every TWA pilot. As it stands, I find myself in the unhappy position of having to make a virtue of stupidity.

Plaintiffs claim that this was an accurate portrayal of the situation, that no members of the Negotiating Committee who were present made any correction to Liston's statement, and that the statement was overwhelmingly approved by the union membership in attendance. Plaintiffs' Memo at 5–6, ¶¶ 17–18. TWA answers that none of this is material; Liston's statement was only his personal opinion and notwithstanding that he held it, he stated he was prepared to "accept the contract." TWA Reply Memo at 7, ¶¶ 17, 18. Further, TWA points out that the contract, including the

no beard clause, was approved overwhelmingly by the ALPA membership in a nonbinding straw vote and ratified by the ALPA–TWA Master Executive Council by a substantial majority. *Id., citing* ALPA Memorandum in Support of Motion for Summary Judgment at 5; Murphey Dep. at 95, 102.

The only legal issue in this case is whether ALPA breached its duty of fair representation.[5] Thus, TWA and ALPA would be entitled to summary judgment only if the above disputed facts are not material and do not relate to the breach of this duty. To determine whether this is so, we turn now to a discussion of the duty of fair representation.

## IV. DUTY OF FAIR REPRESENTATION

The duty of fair representation is a judicially created doctrine enunciated by the Supreme Court in cases arising under the Railway Labor Act, 44 Stat. 577, as amended, 45 U.S.C. §§ 151, *et seq., Steele v. Louisville and Nashville RR.,* 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944), and then extended to unions certified under the National Labor Relations Act. *Ford Motor Co. v. Huffman,* 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953). The purpose of section 151a of the Railway Labor Act, protection and promotion of collective bargaining, is to encourage bargaining by railroads and their employees in order to prevent, if possible, wasteful strikes and interruption of interstate commerce. *Detroit & Toledo Shore Line RR. v. United Transport Union,* 396 U.S. 142, 149, 90 S.Ct. 294, 298, 24 L.Ed.2d 325 (1969).

When Congress empowered unions to bargain exclusively for all employees, it subordinated individual interests to those of the unit as a whole, thereby imposing upon the unions the correlative duty of fair representation. *International Board of Electrical Workers v. Foust,* 442 U.S. 42, 46, 99 S.Ct. 2121, 2124, 60 L.Ed.2d 698 (1979). This duty obligates a union to represent fairly the interests of all the members of the bargaining unit. It is breached only when the conduct of the union is "arbitrary, discriminatory, or in bad faith." *Id.* at 47, 99 S.Ct. at 2125; *Vaca v. Sipes,* 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967).

The Seventh Circuit standard of the duty of fair representation has been clearly defined in several recent cases. *See, e.g., Dober v. Roadway Express,* 707 F.2d 292, 295 (7th Cir.1983) ("[W]e reaffirm that the standard is intentional misconduct."); *Superczynski v. P.T.O.-Services, Inc.,* 706 F.2d 200, 202 (7th Cir.1983) (A union breaches its duty to fairly represent if it acts deliberately and unjustly.); *Graf v. Elgin and Eastern Ry.,* 697 F.2d 771, 778 (7th Cir.1983):[6]

> The union has a duty to represent every worker in the bargaining unit fairly but it breaches that duty only if it deliberately and unjustifiably refuses to represent the worker. Negligence, even gross negligence . . . is not enough; and, obviously, intentional misconduct may not be inferred from negligence whether simple or gross.

In *Dober, Superczynski,* and *Graf,* the Seventh Circuit reaffirmed the narrow standard to determine liability for breach of the duty of fair representation defined earlier in *Hoffman v. Lonza, Inc.,* 658 F.2d 519, 520 (7th Cir.1981) ("[T]he courts may enforce the duty of a union to fairly represent an employee only when union conduct breaching that duty is intentional, invidious, and directed at the employees."), *citing*

---

5. The employer, TWA, is made a party to the lawsuit to ensure complete and meaningful relief. *See Glover v. St. Louis-San Francisco Ry.,* 393 U.S. 324, 329, 89 S.Ct. 548, 551, 21 L.Ed.2d 519 (1969). In essence, however, the dispute is between some 3,000 TWA pilots and ALPA.

6. *But See Dober v. Roadway Express, Inc.,* 707 F.2d 292, 296–298 (7th Cir.1983) (Cudahy, J.

concurring in the result); *Miller v. Gateway Transportation Co.,* 616 F.2d 272 (7th Cir.1980); *Baldini v. Local 1095, UAW,* 581 F.2d 145, 150 (7th Cir.1978) ("[A] union breaches its duty of fair representation when its conduct towards the member is 'arbitrary, discriminatory, or in bad faith.'")

*Motor Coach Employees v. Lockridge,* 403 U.S. 274, 301, 91 S.Ct. 1909, 1925, 29 L.Ed.2d 473 (1971). These cases addressed the union's duty of fair representation in the context of administering the collective bargaining agreement by processing a grievance. Here we are confronted by a case predicated upon claims that the union breached its duty in negotiating a collective bargaining agreement. The Supreme Court has recognized this dichotomy by defining a different standard in each of these two situations.

In *Ford Motor Co. v. Huffman,* 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953), plaintiffs claimed that their union breached its duty of fair representation by agreeing to a contract clause granting seniority credit to employees for time spent in prior military service. A unanimous Court rejected this claim, but recognized that the union is obligated "to represent all members ... and requires them to make an honest effort to serve the interests of all those members without hostility to any." *Id.* at 337, 73 S.Ct. at 685. The Court noted that in contract negotiations negotiators have "discretion to make such concessions and accept such advantages as, in the light of all relevant considerations, they believe will best serve the interests of the parties they represent." *Id.* at 338, 73 S.Ct. at 686.

The Court also observed that in contract negotiations "[t]he complete satisfaction of all who are represented is hardly to be expected" and warned that "[a] *wide range of reasonableness* must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of discretion." *Id.* at 339, 73 S.Ct. at 686. [Emphasis added.] The Court stressed that "[c]ompromises on a temporary basis, with a view to long-range advantages, are natural incidents of negotiations." *Id.*

■ Collective bargaining and union representation maximizes the group interest and necessarily subordinates individual interests and concerns. *See* Leffler, *Piercing the Duty of Fair Representation: the Dichotomy Between Negotiations and Griev-* *ance Handling,* 1979 U.Ill.L.F. 35, 36. Leffler notes that the reasonableness standard (the *Huffman* "wide range of reasonableness") is so easily met in the negotiations context that a union may satisfy its duty of fair representation by showing only that its motives were not improper, and that it acted in good faith and with honesty of purpose. *Id.* at 40. This is entirely proper because during contract negotiations the employees' interest is based upon a generalized expectation of better treatment from the acquisition of new rights, whereas the employees' interest in the administration of an agreement (*e.g.* grievance pursuance) is rooted in the contract. Thus, unions should be and are held to a less exacting duty of fair representation in contract negotiations than when administering an agreement. *See, e.g., Ford Motor Co. v. Huffman, supra,* 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048; *Hendricks v. Airline Pilots Association, International,* 696 F.2d 673, 677 (9th Cir.1983); *Schultz v. Owens-Illinois, Inc.,* 696 F.2d 505, 515 (7th Cir.1982); *Johnson v. Air Line Pilots in the Service of Northwest Airlines,* 650 F.2d 133, 137 (8th Cir.), *cert. denied,* 454 U.S. 1063, 102 S.Ct. 614, 70 L.Ed.2d 601 (1981); *Jones v. Trans World Airlines,* 495 F.2d 790, 798 (2d Cir.1974).

In *Schultz v. Owens-Illinois,. Inc.,* 696 F.2d 505 (7th Cir.1982), the Seventh Circuit reiterated the Supreme Court's standard of the duty of fair representation. The *Schultz* facts are relevant to the instant case. There, prior to a 1971 collective bargaining session, both Owens and the Union interpreted a clause in their previous agreement establishing an Apprenticeship Program as requiring Owens to maintain a ratio of one apprentice for every eight journeymen machinists employed at Owens' plant in Godfrey, Illinois. During 1971, Owens became concerned about the number of journeymen machinists at the Godfrey plant and the high cost of maintaining such a large number of employees in that classification. To remedy this, Owens proposed to the Union during contract negotiations in 1971 that the language of the contract be changed so that the contract could not be

interpreted to *require* Owens to maintain this ratio. Based upon the Union's chief bargaining representative's understanding that the one-to-eight apprenticeship ratio was discretionary and not mandatory, the Union negotiators and Owens agreed to let the contract language remain unchanged. As a result of these 1971 negotiations, Owens continued essentially the same language in the Apprenticeship Article, however with a new understanding that Owens was no longer obligated to maintain any particular ratio. The Company decided not to add any new apprentices to the program and to allow apprentices already on the program to finish the program.

Subsequently, Schultz brought suit, alleging that the Union had breached its duty of fair representation in agreeing to the new interpretation of the Apprenticeship Article. The district court granted the motions of the Union and Owens for a directed verdict, relying in part on the lack of evidence of a breach of the duty of fair representation by the Union. *Schultz*, 696 F.2d at 507. The Seventh Circuit affirmed. The court reiterated that "when assessing the conduct of the union in the course of negotiating with the employer, 'a wide range of reasonableness must be allowed'." *Id.* at 524–25, *citing Ford Motor Co. v. Huffman*, *supra*, 345 U.S. at 338, 73 S.Ct. at 686. The court further observed that:

> The major goal of the duty of fair representation is to identify and protect individual expectations as far as possible without undermining collective interests. Where the individual and collective group interests clash, the former must yield to the latter. When collective bargaining agreements are executed, there may be many provisions which lead individual employees to believe they are entitled to specified benefits but, in the final analysis, the collective group interests must remain paramount. The nature of any labor policy requires an election between preserving group interests through democratic processes and adopting external restraint to protect the minority.

*Alvey v. General Elec. Co.*, 622 F.2d 1279, 1289 (7th Cir.1980) (quoting *Tedford v.*

*Peabody Coal Co.*, 533 F.2d 952, 956–57 (5th Cir.1976); *accord Williams v. Western Elec. Co.*, 530 F.Supp. 481, 486 (N.D. Ill.1981).

*Schultz*, 696 F.2d 505, 516 n. 14.

Recently, in two other circuits, pilots have sued ALPA for an alleged breach of the duty of fair representation in negotiating a collective bargaining agreement. *See Hendricks v. Airline Pilots Association, International*, 696 F.2d 673 (9th Cir.1983); *Johnson v. Air Line Pilots in the Service of Northwest Airlines, Inc.*, 650 F.2d 133 (8th Cir.), *cert. denied*, 454 U.S. 1063, 102 S.Ct. 614, 70 L.Ed.2d 601 (1981). In *Hendricks*, the pilots complained that the union breached its statutory duty of fair representation in negotiating an agreement that released United Air Lines from a "contract" whereby pilots agreed to work during their vacation periods in return for additional compensation. In *Johnson*, the pilots claimed that ALPA breached its duty of fair representation in negotiations with Northwest Airlines and by its acceptance of a collective bargaining agreement which did not extend the seniority rights or rights of recall of certain employees.

■ In both cases, the district courts had granted summary judgment to ALPA and the airline. These judgments were later affirmed by the Eighth and Ninth Circuits. Both circuits noted the delicate balance between the interests of the majority of the Union and those of the minority. *Hendricks, supra*, 696 F.2d at 677; *Johnson, supra*, 650 F.2d at 137. A union has wide discretion in its representation of the bargaining unit and, if acting in good faith, will not be held in breach of its duty simply because some parties are disadvantaged by its actions; because of the majoritarian bias inherent in collective bargaining, there must be some sacrifice of individual freedom. *Id.*

These decisions, of course, are not binding on this court. However, because of the great factual similarities and both courts' well-reasoned approach, we find *Hendricks* and *Johnson* most persuasive. In the con-

text of collective bargaining, especially, the concept of the greatest good for the greatest number,[7] *see* J.S. Mill, ON LIBERTY, is particularly apt.

### V.

■ Applying the Supreme Court's, the Seventh Circuit's and other circuit's analyses of the duty of fair representation in the context of collective bargaining negotiations, we now address the allegedly "disputed facts" in paragraphs 5, 6, 7, 8, 9, 11, 13, 14, 15, 16, 17, and 18 of Plaintiffs' Memo. We bear in mind that the plaintiffs, as the nonmoving party, are entitled to all reasonable inferences in their favor, but they must demonstrate that there are issues that must be decided at trial in order to defeat a motion for summary judgment. *See BA Mortgage and International Realty Corp. v. LaSalle National Bank,* 535 F.Supp. 435 (N.D.Ill.1982). While the burden is on the party moving for summary judgment to show that there is no issue of material fact in dispute, *Dreher v. Sielaff,* 636 F.2d 1141 (7th Cir.1980), an issue of fact is not material unless it has legal probative force as to the controlling issue. *Western Transportation Co. v. Wilson & Co.,* 682 F.2d 1227 (7th Cir.1982).

Paragraph 5. Even if the beard issue was allegedly "finalized" outside of the bargaining room, this is not a material fact. This allegation does not give rise to an inference of a breach of the duty of fair representation. It is undisputed that the clause was discussed at four other bargaining sessions and ratified by the full negotiating committee. Moreover, since collective bargaining negotiations are, by their very nature, a give and take process, restrictive formalities are not conducive to efficient

bargaining. Thus, there is no requirement that "finalization" take place within the actual bargaining room.

Paragraph 6. The length of the discussions regarding the beard proposal is immaterial and not probative, especially considering the length (July 1, 1981 until February 1982) and complexity of the overall agenda (including the hours and locations of company layovers, the furnishing of hotel rooms, standby rules, rules for upgrading from co-pilot to captain and the time required for flying with one type of check pilot, and satellite basing).

Paragraph 7. There is some disagreement among the parties concerning whether TWA's desire to prohibit beards was based on safety or grooming and image considerations. However, we do not find this dispute material to the legal issue. Given the "wide range of reasonableness," *Ford Motor Co. v. Huffman, supra,* 345 U.S. at 339, 73 S.Ct. at 686, that must be afforded the bargaining representative, ALPA's accession to TWA's proposal does not violate the duty of fair representation; it does not indicate bad faith or rise to the level of intentional misconduct. There is undisputed evidence that the negotiations took place in an atmosphere different than previous years. The impact of the downturn of the nation's economy and the deregulation of the airline industry[8] was acutely felt by all the airlines. The negotiators believed that in this round of negotiations it was the era of the "give-back," Haggard Dep. at 24, and that in giving up beards they would be able to make inroads in other areas. Marchione Dep. at 70.

■ Where there is no evidence of hostility, discrimination, intentional misconduct, or bad faith, a court should be very

---

**7.** Only some 150 of the approximately 3,000 represented pilots were immediately affected and had to shave their beards. (Haggard Dep. 66; Marchione Dep. 68)

**8.** One federal labor mediator has observed that while some say that contract negotiations should go more smoothly now because union and management have more reasons to cooperate in hard times, he has found it tougher being a mediator in a recession. He now presides

over sessions where "They're talking about concessions that leave the union in a quandary about what it can afford to give up. They're negotiating about freezing or cutting wages or reducing benefits that union members have enjoyed for years. It's a lot more difficult than haggling over a 60-cent versus a 50-cent increase in good times." *See* Chi.Trib. Magazine, Aug. 14, 1983, at 30.

reluctant to second guess the parties to good faith, arms length bargaining negotiations. Here, the evidence indicates that ALPA's decision to agree to the no beards proposal "reflected a proper resolution of conflicting but legitimate interests," *see Alvey v. General Electric Co.,* 622 F.2d 1279, 1289 (7th Cir.1980), and that ALPA exercised "complete good faith and honesty of purpose in the exercise of its discretion." *See Schultz v. Owens-Illinois, Inc., supra,* 696 F.2d at 515, *citing Ford Motor Co. v. Huffman,* 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953).

■ Plaintiffs' allegations of hostility and discrimination [9] are insufficient to preclude summary judgment for defendants. Accepting plaintiffs' version of the facts, there is no factual support for these allegations. Indeed, in paragraph 8 of Plaintiffs' Memo, plaintiffs observe that no bearded TWA cockpit personnel was disciplined for violation of the personnel regulations in existence after the Richards Decision. Nor have plaintiffs shown any motive to "do them in." A conclusory allegation is not sufficient to raise genuine issues of material fact. *Hall v. Printing and Graphic Arts Union, Local # 3,* 696 F.2d 494, 500 (7th Cir.1982). The mere possibility of discrediting one's opponents' denials at trial does not present an issue of fact that will defeat summary judgment. *Weit v. Continental National Bank & Trust Co. of Chicago,* 467 F.Supp. 197, 208–09 (N.D.Ill.1978), *aff'd,* 641 F.2d 457 (7th Cir.1981), *cert. denied,* 455 U.S. 988, 102 S.Ct. 1610, 71 L.Ed.2d 847, *reh'g denied,* 456 U.S. 938, 102 S.Ct. 2001, 72 L.Ed.2d 461 (1982).

The so-called disputed facts in paragraphs 9, 11, 13, 14, 15, 16, 17 and 18 are not

enough to defeat defendants' motion for summary judgment since they are not material to the legal issue in this case. *See Terket v. Lund,* 623 F.2d 29 (7th Cir.1980). Accordingly, as there is no material factual issue in dispute and there is no evidence of the requisite intentional misconduct or bad faith, the "wide range of reasonableness" standard authorizes the grant of summary judgment to ALPA and TWA.

The duty of fair representation does not create freewheeling jurisdiction for us to reevaluate union decisions, *James v. United Air Lines, Inc. and Air Line Pilots Association,* 567 F.Supp. 1467 (D.Colo.1983), or for us to engage in splitting hairs. And we are hesitant to second-guess the merits of a union's decision, especially in a situation where the union felt pressured to maintain current salary levels and working conditions and feared that "give-backs" might be necessary. Mindful that a trial court must exercise extreme caution in summary judgment proceedings where intent and motive are at issue, nevertheless, we have thoroughly examined the many affidavits and exhibits of both parties and can find no factual support for plaintiffs' assertions of discrimination, hostility, bad faith, and intentional misconduct which might constitute a breach of the duty of fair representation.

All of this is not to suggest that we agree with the "no beards" policy. Given the widespread sporting of beards by males in every walk of life, it probably is an unnecessary intrusion in what should be a personal decision. On a previous occasion, we noted the erratic history of the exercise of power by the possessors thereof with respect to beards.[10] We pointed out that dur-

---

**9.** Plaintiffs have not tied their complaints of discrimination to any statutory or constitutional provision. They cite no authority, other than the now superseded arbitration agreement, the Richards Decision, that gives them any enforceable right to wear beards. But parties to a contract are free to modify or amend it. The agreement to nullify the Richards Decision in subsequent collective bargaining does not, in and of itself, amount to discrimination or a breach of the duty of fair representation. *See, e.g., Maurer v. UAW,* 105 LRRM 2883 (M.D.Pa.

1980). Even the right of employees to engage in a sympathy strike, like most statutory rights, can be relinquished by a union in a collective bargaining agreement. *United States Steel Corp. v. N.L.R.B.,* 711 F.2d 772 at 775 (7th Cir.1983).

**10.** *Mulvain v. Laird,* No. 69 C 1474 (N.D.Ill. Sept. 10, 1969). *See also Judge criticizes Army in beard case,* Chi. Sun Times, Sept. 11, 1969, at 4, col. 2; *Fuzz on Face is O.K. for GIs, Judge Asserts,* Chicago Trib., Sept. 11, 1969, at 16,

ing the Civil War, all Union officers were required to wear full beards. We did this in the course of granting a preliminary injunction to an Army reservist who was being ordered to active duty because he refused to remove his beard.

██ While the policy may be ludicrous and stupid, as pilot Liston characterized it, even though a number of airlines have it and ALPA has agreed to its inclusion in other contracts, it does not violate any statutory or constitutional prohibition against discrimination. Nor, as we have found, did ALPA breach its duty of fair representation. Employers and representatives of employees are free to negotiate conditions of employment which may seem unwise or even ludicrous to some employees. But unless the contract provisions violate some statutory or constitutional prohibition or the union representatives in negotiating them are guilty of deliberate misrepresentation or misconduct, they are enforceable. The employees' remedy rests in changing their leadership and representatives and renegotiating the objectionable contract provision at the next collective bargaining opportunity.

### CONCLUSION

For the reasons stated, summary judgment is granted to TWA and ALPA. An order to that effect will be entered.

col. 1. Our comments on beards were prompted by a suit brought by reservist Mulvain who claimed that his superior officers had ordered him to active duty because he would not shave off his beard and mustache. On that occasion we said, "Before I'd tell him to shave off his beard, they'd have to convince me that it was for practical reasons—that it interfered with his shooting a rifle or that it attracted vermin." Sun-Times, *supra*.